Case: 1:26-cv-08697 Document #: 1 Filed: 07/22/26 Page 1 of 88 PageID #:1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| NICHOLAS ISEL, an individual )<br>)<br>        Plaintiff,                    )<br>                                      )<br>v.                                    )<br>                                      )<br>U.S. FOOD AND DRUG ADMINISTRATION;    )<br>        10903 New Hampshire Avenue    )<br>        Silver Spring, MD 20993       )<br>                                      )<br>KYLE DIAMANTAS, J.D., in his official capacity )<br>as Acting Commissioner of Food and Drugs )<br>U.S. Food and Drug Administration     )<br>                                      )<br>GRACE GRAHAM, in her official capacity as )<br>Deputy Commissioner for Policy, Legislation, )<br>and International Affairs -  U.S.     )<br>Food and Drug Administration;         )<br>                                      )<br>KARIM MIKHAIL, M.S.,  in his official capacity )<br>as Director of the Center for Biologics Evaluation )<br>and Research (CBER) --  U.S. Food and Drug )<br>Administration;                       )<br>                                      )<br>Olivia Ziolkowski, JD, MPH, Ph.D. in her official )<br>capacity as Center for Biologics Evaluation and )<br>Research (CBER) Ombudsman -  U.S. Food )<br>and Drug Administration;              )<br>                                      )<br>U.S. DEPARTMENT OF HEALTH AND         )<br>HUMAN SERVICES;                       )<br>        200 Independence Avenue SW     )<br>        Washington DC 20201            )<br>                                      )<br>ROBERT F. KENNEDY, JR.in his official capacity )<br>as Secretary of the U.S. Department of Health and )<br>Human Services; and                   )<br>                                      )<br>DONALD J. TRUMP, President of the     )<br>United States of America              )<br>        1600 Pennsylvania Avenue       )<br>        Washington, DC 20500           )<br>                                      )<br>        Defendants.                    ) | No. 26-cv-8697 |

## COMPLAINT FOR ADMINISTRATIVE REVIEW
## AND DECLARATORY RELIEF

NOW COME Plaintiff, NICHOLAS ISEL, an individual, by and through his attorneys, ROZOVICS LAW FIRM, LLC, bring this Complaint against the Defendants, U.S. FOOD AND DRUG ADMINISTRATION (hereinafter "FDA"), KYLE DIAMANTAS, J.D., in his official capacity as Acting Commissioner of Food and Drugs – U.S. Food and Drug Administration ("FDA Commissioner" or "FDA Commissioner DIAMANTIS") and as successor to prior FDA Commissioner STEPHEN HAHN, M.D. ("prior FDA Commissioner HAHN"), GRACE GRAHAM, in her official capacity as Deputy Commissioner for Policy, Legislation, and International Affairs – U.S. Food and Drug Administration ("Deputy Commissioner for Policy GRAHAM"), and as successor to prior Principal Associate Commissioner for Policy Lowell J. Schiller, (hereinafter "prior Associate Commissioner SCHILLER"), KARIM MIKHAIL, M.S., in his official capacity as Director of the Center for Biologics Evaluation and Research (CBER) – U.S. Food and Drug Administration ("CBER Director MIKHAIL"), and as successor to prior CBER Director Peter Marks, M.D., Ph.D (hereinafter "prior CBER Director MARKS"), OLIVIA ZIOLKOWSKI, JD, MPH, Ph.D. in her official capacity as Center for Biologics Evaluation and Research (CBER) Ombudsman – U.S. Food and Drug Administration ("CBER Ombudsman ZIOLKOWSKI"), and as successor to prior CBER Ombudsman Sheryl Lard-Whiteford, Ph.D, (hereinafter "prior CBER Ombudsman LARD-WHITEFORD"), and ROBERT F. KENNEDY, JR. in his official capacity as Secretary of the U.S. Department of Health & Human Services (hereinafter "HHS Secretary KENNEDY"), and as successor to prior HHS Secretary XAVIER BECERRA ("prior HHS Secretary BECERRA"), and DONALD J. TRUMP, The President of the United States of America, and in support thereof, state as follows:

## I. INTRODUCTION

2

1.     Plaintiff, NICHOLAS ISEL, brings this action under the Administrative Procedure Act as a challenge to the federal government's erroneous, arbitrary, and unconstitutional final decision in a Citizen Petition which has deprived ISEL, and Donor-Conceived Persons like him, of equal protection under the law.  Plaintiff seeks a declaration that the FDA has acted unlawfully by refusing to take the requested corrective action as requested in the ISEL Citizen Petition to increase the time required for regulated Establishments to maintain Relevant Medical Records of those who are donors of reproductive sperm or oocytes (eggs) from 10 years to 50 years.

2.     Plaintiff seeks injunctive relief requiring the Defendants to approve the requested change in its Citizen Petition, and to strike improperly asserted pronouncements made by the FDA in responding to the Citizen Petition that Donor-Conceived Persons such as ISEL are not entitled to invoke any rights under Part 1271, including any requests for donor records under 21 C.F.R. 1271.55(d)(4), as Donor-Conceived Persons are not intended beneficiaries of the regulations which govern every aspect of the transaction leading to their donor-conceived birth. The injunctive relief is further requested due to the arbitrary, capricious and legally inconsistent interpretations of the FDA's own mission statement to exclude access to records of reproductive donors' records which have genetic testing or historical information, on the misguided premise that this information does not provide information to the donor's biological descendent about the introduction, transmission or spread of communicable diseases.  Plaintiff further seeks a declaratory judgment that the FDA's denial to take the requested action violates the APA and violates the constitutional rights of Donor-Conceived Persons, including NICHOLAS ISEL, and his own biological descendants.

3.     There is only a single body of federal regulations in the United States which reaches outside the bedroom of Americans to exert exclusive control over where, whether, how, and in what facility a new human life will be allowed to be conceived within the United States with the

help of medical science. Most sources of law that regulate, restrict and limit the rights of American citizens do so only after the potential American has been conceived and, in most cases, born. The single exception is 21 C.F.R. 1271, which governs Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/P's), and is administered by the Food and Drug Administration, pursuant to delegation of authority from the Department of Health and Human Services.

4.      The only class of Americans which suffers a devastating loss of rights prior to their birth, by operation of this body of federal regulations, is known as Donor-Conceived Persons. This lawsuit is brought on behalf of NICHOLAS ISEL, one such Donor-Conceived Person, whose records of his biological sperm donor's health and familial history were permanently destroyed by the FDA-regulated Donor Establishment which had provided ISEL's sperm years before ISEL reached the age of majority, when he was merely 14 years old. This destruction of vital records, which were collected about the background and health history of ISEL's sperm donor pursuant to detailed FDA regulations near the time of the sperm donation, occurred prior to the time ISEL learned of his status as a Donor-Conceived Person. At the time of the destruction of his records, ISEL as a 14-year-old minor with no knowledge of his status as a Donor-Conceived Person, had no reason to inquire about the existence of a sperm donor, or about the existence of records relating to such a sperm donor, or to wonder about any destructive activities taken by the FDA-licensed Repository for Germinal Choice operating more than 2000 miles away in the State of California.

5.      Every day more Donor-Conceived Persons permanently lose the ability to obtain vital health records while they are still minors and/or while they have not yet learned they were born with the assistance of donated gametes, just like those ISEL lost when he was 14 years old.

6.  Where the life of a U.S. citizen, like Plaintiff NICHOLAS ISEL, has his first medical origins not in a hospital or doctor's office, but in an FDA-regulated Sperm and/or Oocyte Donation

4

Facility Establishment regulated by the FDA under 21 C.F.R. 1271.3, it is incumbent upon that government agency to ensure that their tightly controlled regulations do not deprive those sperm and oocyte donations, which will be born and grow into Donor-Conceived Persons, of their Constitutional rights. Unfortunately for ISEL and similarly situated Donor-Conceived Persons throughout this country, the FDA has used its tight regulatory control to strip from all Donor-Conceived Persons any practical rights while they are still legal minors and/or do not yet know that their life originated with the use of donated gametes. since § 1271.55(d)(4) results in Establishments destroying donor records a mere 10 years after the last "administration" of the donor sperm or oocyte materials for reproductive purposes.

7. Through 21 C.F.R. 1271, the FDA governs every aspect of the Assistive Reproductive Technology industries in the United States, beginning with its determination of which entities or "Establishments" will be allowed to be involved in the sale of sperm and/or oocytes in that industry, and how they must operate. Part A of 1271 creates and maintains an electronic registration and listing system for Establishments that manufacture human cells, tissues, and cellular and tissue-based products (HCT/Ps), and sets forth requirements to establish donor-eligibility, current good tissue practice, and other procedures to prevent the introduction, transmission, and spread of communicable diseases by HCT/Ps. § 1271.1(a). Human cells, tissues, or cellular or tissue-based products (HCT/Ps) include "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." § 1271.3(d). By definition, this includes all donated gametes such as donor sperm and donor oocytes (eggs) to be used for In Vitro Fertilization (IVF) or other reproductive purposes.

8. The FDA sets a 10-year period of time after last administration during which Establishments must maintain a Donor's records and materials, after which they may be

permanently destroyed. 21 C.F.R. 1271.55(d)(4). Part of each Establishment's obligations is to obtain and maintain a "Relevant Medical Records" of a sperm or oocyte (egg) Donor, including but not limited to a Donor's medical history interview, medical history and relevant social behavior, including activities, behaviors, and descriptions considered to increase the donor's relevant communicable disease risk. § 1271.3(n); a current report of the physical examination of the living donor; and available laboratory tests results, medical records, records of other information received from any source pertaining to risk factors for relevant communicable diseases (e.g. social behavior, clinical signs and symptoms of relevant communicable disease, and treatments related to medical conditions suggestive of risk for relevant communicable disease), for any disease agent for which there is a risk of transmission from the donor to other donors, or to those who handle the donated materials. §§ 1271.3(r) and (s).

9. The records maintained by FDA-regulated Establishments pursuant to 21 C.F.R. 1271.55(d)(4) contain vital information which biological offspring, such as NICHOLAS ISEL, require about their Donor's health history, including physical conditions and diseases, mental health diagnoses and treatment (or lack thereof as of the time of donation), medication history, as well as donor familial information.

10. Although genetic testing is not required by Part 1271, upon information and belief, many FDA-regulated Establishments today include it, along with other increased questions about familial history of heritable diseases, in an effort to increase marketability of their sperm and oocyte donor services to the public. Results of any genetic testing, and information derived from genetic testing, including monitoring of genetic risks of inheritable diseases, would be a part of the Relevant Medical Record defined under § 1271.3(s).

11. Upon information and belief, any time genetic testing and information derived from genetic testing is included within the Relevant Medical Record, the Donor provides authority for disclosure of such information to the recipient of the donated gametes and/or their offspring born from such donated gametes, , in writing pursuant to 45 C.F.R. 160.103 and the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 (hereinafter "HIPAA") as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, Public Law 111-05 (hereinafter "HITECH"), and any subsequent amendments thereto and any regulations promulgated thereunder.

12. When records of donated gametes are destroyed under the 10-year-after-last-administration rule, § 1271.55(d)(4), any of that donor's records relating to genetic testing and information derived from genetic testing, including any genetic risk assessment and familial historical disease tracking, are included with the Relevant Medical Record and are similarly destroyed.

13. Access to the Relevant Medical Records as defined within the § 1271.3(s), including any donor genetic testing and information derived from genetic testing, including any genetic risk assessment and familial historical disease tracking, is vital for every Donor-Conceived Plaintiff and their biological offspring, and was vital for Plaintiff ISEL, and each of his biological children. Fifty percent of a Donor-Conceived Person's genetic makeup is transmitted to them by the anonymous sperm or oocyte (egg) donor. The Relevant Medical Records maintained by the FDA-regulated Establishment of that anonymous donor are frequently the only place where information is stored about that donor's health history at or near the time of the gamete donation. It is only through obtaining their sperm or oocyte (egg) Donor's Relevant Medical Records that a Donor-Conceived Person can acquire key first-person account of biological and historical details

7

of their anonymous biological parent's medical conditions, chronic illnesses, genetic heritability of conditions, and prescription medication history. This is the only method by which they will be able to learn about the bio-Donor's allergies or history of adverse effects to certain treatments or prescription medications. This is the only method by which they will be able to obtain information which the bio-Donor had about their parents' and grandparents' medical history, which provides further important information about heritability of physical and mental health conditions.

14.    Every person reading this Complaint knows first-hand the importance of being able to provide complete, accurate, and thorough information to their own medical professionals each time they seek medical treatment and complete a "past medical history" and "past family history" sheet for their own physician.  Like all Americans, Donor-Conceived Persons have a vital need to provide their own physicians with a comprehensive physical and mental health history, including familial history of conditions and treatments received by both paternal and maternal ancestors, and genetic testing and information derived from testing where available, to aid physicians in developing an optimal plan for their physical and mental health care. The ability to gain access to their own medical and familial Designated Record Set, created and maintained by the FDA-regulated HCT/P Establishments, is crucial for Plaintiff NICHOLAS ISEL, and all similarly situated Donor-Conceived Persons', ability to maintain and improve their health throughout their lives, as their physicians require access to this historical information about familial medical history, genetic conditions, medications, and chronic diseases, in order to guide clinical decisions about the Plaintiff's own course of treatment, potential diagnoses, and potential treatment and/or medication option which may be available to Plaintiff ISEL or his biological children.

15.    When one-half of a Donor-Conceived Person's familial medical history is permanently destroyed at an arbitrary point in time before they reach adulthood, or at a point before

8

they have a reasonable opportunity to access the records of their bio-Donor because they are not even aware that they were conceived using donated gametes, irreparable harm inevitably follows. Donor-Conceived Persons who lack access to their bio-Donor's prematurely destroyed records will receive less comprehensive care, will have to undergo additional testing, will have to spend more money to receive equivalent levels of care, and will be subject to more medical guesswork and medical errors in diagnosis and treatment than those Americans who are not born from donated gametes. NICHOLAS ISEL and other Donor-Conceived Persons like him have been, and continue to be harmed by the permanent and irrevocable destruction of their bio-Donors' Relevant Medical Records sets, which includes the only contemporaneous-to-donation recorded health questionnaire and vital information and testing about the often anonymous donor's background, personal and familial physical and mental health conditions. The damage to these Donor-Conceived Persons also extends to their biological children, and subsequent generations, who will forever lack a complete medical history of their donor ancestor, and therefore, themselves.

16. Every Donor-Conceived Person born in America as a result of a sperm or oocyte donation from a HCT/P-regulated Establishment will face the same barriers to access as the Donor-Conceived Plaintiff NICHOLAS ISEL who brought this matter to the attention of the FDA through his brave Citizen Petition. As noted within the history section of this Complaint, hundreds of similarly situated Donor-Conceived Persons commented on the ISEL Citizen Petition, in order to tell their harrowing stories of records destroyed and forever lost as a result of FDA bureaucracy. This deprivation of one's own most basic health history facts by virtue of a government regulation mandating destruction of vital health records of 50% of your biological ancestors, at a time when one is merely a minor child, or unaware of one's status as a Donor-Conceived Person because your

identity was hidden from you, is something which naturally conceived Americans have never, and will never, face.

17.     The FDA both creates and amplifies the statutory and practical barriers placed in front of the Donor-Conceived Population.

18.     Whether viewed from a social, political, legal, or financial perspective, the health and well-being of the American population has never been more important.  In order to maximize each citizen's health, the U.S. government has, through the past half-century, studied and implemented, with varying degrees of success, public policy statements, agency action, Presidential Executive Orders and Legislation,  setting forth policies which encourage "the timely use of personal health services to achieve the best health outcomes."[1] This trend has only grown stronger in recent years, with enacted laws and implementing agency regulations to ensure that each American will have achieve the goal of equal access to comprehensive, quality healthcare services which will prevent and manage disease, reduce risks of disability and premature death, and achieve health equity for all Americans.[2]  Attaining good access to care means having, *inter alia*, timely access to needed care, a usual source of care with whom the patient can develop a relationship, and the ability to receive care when there is a perceived need for care.[3]

19.     In the present administration, Defendants Health and Human Services Secretary ROBERT F. KENNEDY, JR., and The President of the United States, DONALD J. TRUMP, have made American health a central theme through their "Make America Healthy Again" (MAHA)

---

[1] Institute of Medicine, Committee on Monitoring Access to Personal Health Care Services. Access to Health Care in America. Millman M, ed. Washington, DC: National Academies Press; 1993. https://www.ncbi.nlm.nih.gov/books/NBK235882/.

[2] Office of Disease Prevention and Health Promotion. HealthyPeople.gov. Access to Health Services. https://www.healthypeople.gov/2020/topics-objectives/topic/Access-to-Health-Services.

[3] Per the National Library of Medicine, National Center for Biotechnology Information, reporting on measures of access to care tracked in the National Healthcare Quality and Disparities Report (NHQDR), available at  https://www.ncbi.nlm.nih.gov/books/NBK578537/#

initiative, which they contend they will achieve their stated policy goals of increasing the health of the American population. In order to promote his MAHA agenda, TRUMP issued a number of Executive Orders, including Executive Order No. 14212, issued February 13, 2025, entitled "Establishing the President's Make America Healthy Again Commission" ("MAHA Order")[4], Executive Order No. 14216, issued February 18, 2025, entitled "Expanding Access to in Vitro Fertilization" ("In vitro Order")[5], as well as Executive Order No. 14292, issued May 5, 2025, entitled "Improving the Safety and Security of Biological Research.[6]

20.    At the same time the FDA claims it is unable to provide real, live Donor-Conceived American Citizens the right to access their own donor's Medical Record have even indicated their prioritization of considering, with respect to grant programs involving embryos created by In Vitro Fertilization, "the best interests of the child at the center of all activities, encompassing the child's right to know their biological origins and medical history…"[7]

21.    Section 21 C.F.R. 1271, as it is interpreted by the FDA, impermissively and unconstitutionally allows FDA-regulated reproductive ART Establishments to ignore and terminate the rights of Donor-Conceived Persons while they are still legal minors, merely because of their status as Donor-Conceived Persons, thereby denying them equal treatment under the law. All States in which Plaintiff ISEL resided during his life, and in which the FDA-regulated

---

[4] Exec. Order No. 14212, Establishing the President's Make America Healthy Again Commission, 90 Fed. Reg. 9833 (Feb. 13, 2025).

[5] Exec. Order No. 14216, Expanding Access to In vitro Fertilization, 90 Fed. Reg. 10451 (Feb. 18, 2025).

[6] Exec. Order No. 14292, Improving the Safety and Security of Biological Research, 90 Fed. Reg. 19611 (May 5, 2025).

[7] See, eg, references to embryos as "children" in U.S. Department of Health and Human Services, Office of Population Affairs, Notice of Funding Opportunity, Embryo Adoption Awareness and Services, Opportunity Number PA-EAA-26-001, available at https://files.simpler.grants.gov/opportunities/167d140c-52a1-4ebb-99be-ecddf378082d/attachments/13b771a1-4ca4-4420-a526-efabdbccb0da/PA-EAA-26-001_EAA_NOFO.pdf

11

Establishment maintaining their records were located, have laws that would entitle any person to the preservation of, and obtain access to, those records comprising their vital medical and familial health history, such as the ones under § 1271.55(d)(4), until, at a minimum, the age of majority or a sufficient period of time after the Donor-Conceived Person can be expected to learn of their Donor-Conceived status and seek such records. The Plaintiff, a resident of Illinois, is entitled under the network of laws governing health information in the state, to seek out his vital medical and familial health history until, at a minimum, he is 22 years old. The Repository for Germinal Choice, a California entity, had duties under California law to maintain the records of Plaintiff ISEL, a minor, until he was at least 20 years old. The FDA deprived the Plaintiff ISEL of equal protection he would have received under the laws if he had not been a Donor-Conceived Person by creating a regulatory scheme which "allows" for permanent destruction of the Relevant Medical Records of Donor Coral #36 prior to the time he reached the age of majority. Thus, ISEL's sperm donor's records, including medical history interview, laboratory test results, physical examination, medical records and all other information collected were destroyed when he was a legal minor, and unable to assert any of his rights under state or federal law.

22. In order that Donor-Conceived Persons can fulfill the hopes and expectations which President DONALD J. TRUMP and HHS Secretary ROBERT F. KENNEDY have for them to be healthy Americans, the Plaintiff NICHOLAS ISEL wishes to obtain for himself, for his biological children, and for other Donor-Conceived Persons similarly situated to him throughout the United States, including for those Donor-Conceived Persons who provided Public Comments to the Isel Citizen Petition, copies of essential and vital records from his Donor's Relevant Medical History, so that he can review same and provide it to the medical professionals who provide them with care and treatment. Specifically, ISEL seeks to use the network of privacy and healthcare laws,

12

including Illinois-based hospital and medical record retention requirement statutes, as well as federal laws such as the Right of Access under 45 C.F.R. § 164.524(a) of the Health Insurance Portability and Accountability Act ("HIPAA"), Health Information Technology for Economic and Clinical Health Act, or HITECH Act, the 2013 Omnibus Rule amendments enacted by HHS, and certain 2022 and 2025 Industry Guidances issued by the FDA to obtain unfettered access to their medical information, histories and/or records which comprise their "Designated Record Set" of essential and vital health information.

23.     In 2021, 86,146 infants (2.3% of all infants born in the U.S.) were conceived through the use of Assistive Reproductive Technology (ART) procedures such as in vitro fertilization (IVF).[8] In this context, IVF includes both donated and non-donated gametes for implantation into the mother. Although there are no laws mandating recordkeeping for donated gametes in the United States, The National Survey of Family Growth estimates that from 2015 through 2019, approximately 1.7 percent of women ages 15-49 years of age had undergone Artificial insemination, with an additional 0.5 million using other types of Assisted Reproductive Technology.  Other experts estimate that approximately half a million women have undergone donor insemination each year, with the numbers increasing every year.[9]

24.     At its core, this case is about whether it is improper and discriminatory for the FDA to continue to refuse to make any updates to the 21 C.F.R. 1271.55(d)(4),  despite knowing from

---

[8] Fact Sheet: In Vitro Fertilization (IVF) use Across the United States, U.S. Health and Human Services, March 13, 2024, available at https://us.pagefreezer.com/en-US/wa/browse/0a7f82bb-be6e-448a-ae11-373d22c37842?find-by-timestamp=2025-01-02T05:49:59Z&url=https:%2F%2Fwww.hhs.gov%2Fabout%2Fnews%2F2024%2F03%2F13%2Ffact-sheet-in-vitro-fertilization-ivf-use-across-united-states.html&timestamp=2025-01-02T07:03:02Z

[9] Key Statistics from the National Survey of Family Growth,  available at https://www.cdc.gov/nchs/nsfg/key_statistics/i-keystat.htm#infertilityservices; see also, Arocho R, Lozano EB, Halpern CT. Estimates of donated sperm use in the United States: National Survey of Family Growth 1995-2017. *Fertil Steril*. 2019;112(4):718-723. doi:10.1016/j.fertnstert.2019.05.031

the Isel Citizen Petition that the application of this section destroys essential medical documents of donor-conceived minors, thereby depriving them of rights and information essential to their medical treatment, including for inherited medical or mental health conditions which have a high incidence of genetic heritability, such as, *inter alia*, schizophrenia. The FDA unlawfully refused to change the 10 year period to 50 years, despite evidence showing that many donor-conceived children do not become aware of their status as donor-conceived until long after reaching the age of majority, and while knowing this is essential to protect these individuals against loss of essential rights as a result of the statutory scheme put in place by 21 C.F.R. 1271. Such a denial was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law. The FDA wrongfully, vaguely, and arbitrarily claimed, in violation of its own definitions and regulations and practice, that it had no authority from HHS to consider inherited conditions passed from donors to offspring, or to otherwise look at how genetic material is transmitted in human tissues. The FDA failed to follow its own regulations, and failed to provide any lawful, non-arbitrary, supported reason for failing to do so. As such, the FDA is not entitled to any deference in its decision to deny the Citizen Petition and the change to the Regulations.

25. This Court should grant Plaintiff a temporary restraining order, and preliminary and permanent injunctive relief, in accordance with the best interpretation of statutory and constitutional interpretation, as such are necessary to prevent Donor-Conceived persons from being harmed by the following unlawful and unconstitutional acts of the FDA which so lack reason and support as to be entitled to neither deference nor any persuasive or informative weight:

1) the FDA's unlawful refusal to grant ISEL's Citizen Petition and thereby modify § 1271.55(d)(4) to extend the time for mandatory maintenance of Relevant Medical Records from 10 to 50 years, to protect against premature destruction of records before Donor-

14

Conceived Persons reach the age of majority and to allow a reasonable amount of time after the age of majority for the discovery that they were, in fact, conceived through the use of donated gametes;

2) the FDA's unconstitutional refusal to grant ISEL's Citizen Petition based upon an arbitrary and capricious summary determination in its Response to the Citizen Petition, which the FDA made without providing the requisite public notice and opportunity for public comment, that Donor-Conceived Persons such as ISEL are not within the scope of Part 1271's intended beneficiaries and are therefore not entitled to invoke any rights such as obtaining records maintained by Establishments under 21 C.F.R. 1271.55(d)(4), when no such exclusion of Donor-Conceived Persons was ever contemplated, discussed or made during the rulemaking process; and

3) the FDA's arbitrary, capricious and legally inconsistent interpretation that it lacks the authority to make any of the changes requested in the ISEL Citizen Petition based upon a lack of delegation authority from HHS to the FDA under Section 361 of the Public Health Service Act (PHS Act)(42 U.S.C. 264) to consider transmission of heritable or genetic conditions as an element of Eligibility of Donors providing gametes for reproductive purposes, with the FDA claiming such is beyond its capability to make and enforce regulations as it deems necessary to prevent the introduction, transmission, or spread of communicable diseases. However, since the FDA has voluntarily undertaken regulation of multiple types of genetic tissues and testing at or near the same time period as it ruled against the ISEL Citizen Petition, its own inconsistent actions belie the claimed limitation on its regulatory mandate. Instead, the FDA's blanket refusal to apply Section 1271 to Donor-Conceived Persons seeking information about their bio-donors is a lazy attempt to

15

avoid updating the regulatory scheme the FDA controls to address modern genetic testing and information collected from those genetic tests. At a minimum, the FDA would have had to undergo notice-and-comment rulemaking under the Administrative Procedure Act before changing a requirement affecting, and indeed eliminating, the constitutional rights of Donor-Conceived Persons which the FDA and its regulations have, quite literally, birthed.

26. Unless this Court grants an injunction and requires the FDA to amend Title 21 Code of Regulations Part 1271.55(d)(4), Donor-Conceived Persons within the United States will continue to have their personal, medical and biological familial health information destroyed on a daily basis, in accordance with the unlawful regulatory scheme set in motion by the FDA under 21 C.F.R. 1271.

27. Individuals who were born of donated gametes with the use of ART (Assisted Reproduction Technologies) have the right to live with dignity, be free from discrimination, and have equal access to the benefits conveyed by the laws of the United States and each individual State that such donor-conceived individual resides in, including the Right to Access one's own medical records and to have access to one's own family history in those medical records. The FDA has created and chosen to enforce a discriminatory statutory scheme which authorizes HCT/Ps Establishments which are regulated by the FDA to destroy essential bio-parental medical records, causing the government-authorized permanent and irrevocable destruction of what is often the only record of the donor-conceived individual's health history, including evidence of genetic testing and identifying markers for inheritable physical and/or mental health conditions. This government-authorized destruction interferes with the rights of Donor-Conceived Persons to access health record information which impacts their own health, impedes the donor-conceived

person's access to accurate and quality health care, and causes substantial and tangible economic, physical, and emotional harms for both the donor-conceived individual, as well as the donor-conceived individual's biological offspring, who will also forever be deprived of such information relating to their ancestors.[10]

28.     The FDA is hoping the Donor-Conceived population will sit idly by while it unconstitutionally and arbitrarily strips away their rights, tells its regulated Establishments they can hit the "Delete All" key on their medical and genetic information, and doom their biological children to never know their donor ancestors' medical and genetic history.

29.     The FDA is wrong. Donor-Conceived Americans cannot be silenced. They are entitled to this information about their origins.

30.     Each day the FDA refuses to act to amend Part 1271.55(d)(4), and refuses to act upon the well-founded ISEL Citizens' Petition, FDA-regulated HCT/P Establishments permanently destroy more donor vital records relating to another 400 to 500 United States citizens whose biological gamete donors had their last "administration" 10 years ago, and who birthed into this world  a Donor-Conceived newborn 9 years and 3 months ago – even if nobody bothered to tell them their birth origin story yet.

## II.  JURISDICTION AND VENUE

31.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action which arises under federal law and the Constitution of the United States, and under 5 U.S.C. § 702, as this is a civil action seeking judicial review of a final agency action.

---

[10] See, eg, Ravitsky V., Conceived and deceived: the medical interests of donor-conceived individuals.  Hastings Cent. Rep 2012 Jan-Feb; 42(1): 17-22.  Doi: 10.1002/hast. 9 PMID: 22616395.

32.     Venue is proper in this district under 28 U.S.C. § 1391(d) because the Plaintiff NICHOLAS ISEL resides in this district and each of the Defendants is an officer of the United States, acting in his official capacity, or an agency of the United States.

33.     Federal law authorizes the Plaintiff's claims for injunctive relief in 28 U.S.C. § 2202, 21 C.F.R. 10.45 and Rule 65 of the Federal Rules of Civil Procedure.  The claim for declaratory relief is authorized by 28 U.S.C. § 2201, 21 C.F.R. 10.45, and Rule 57 of the Federal Rules of Civil Procedure.  The Plaintiff's claims for equitable relief are further authorized by the general legal and equitable powers of the Court.

34.     This is a challenge under the Administrative Procedures Act ("APA"), 5 U.S. Code § 701, *et seq,* 21 C.F.R. 10.45, and the United States Constitution to the denial by the Food and Drug Administration ("FDA") of a Citizen Petition.

### III. THE PARTIES

#### A. Plaintiff

35.     Plaintiff NICHOLAS ISEL was the Petitioner in the Isel Citizen Petition filed on September 27, 2016 (Exhibit A), as well as the Petition for Reconsideration filed on September 8, 2018 (Exhibit C), and the formal Dispute Resolution Request (Exhibit E).

36.     Plaintiff NICHOLAS ISEL is a resident of Kendall County, Illinois, who was born in 1985 using sperm donation from Donor Coral #36, who provided donated sperm to ISEL's mother through the Repository for Germinal Choice.  He is a citizen of Illinois for diversity purposes.

37.     Plaintiff NICHOLAS ISEL has been a resident of Illinois for his entire life, including at the time he was a legal minor aged 9 years 3 months old, when he turned 18 years old and reached the age of legal majority, and at all times between those dates and since those dates.

18

38.     The Repository for Germinal Choice (hereinafter "RGC") was a sperm bank which operated in Escondido, California from 1980 to 1999, which the founder Robert K. Graham intended as a partial experiment in social engineering and partial science experiment, in order to preserve and multiply the best genes of his generation, such as Nobel Prize winners.

39.     In approximately the summer of 2001, when he was 16 years old and a legal minor under the laws of both Illinois and California, NICHOLAS ISEL learned about his birth origins, and attempted to obtain records related to his conception from the California company RGC, but was advised the company had closed and all records (including those relating to his conception and sperm donor) had been destroyed.

40.     Plaintiff NICHOLAS ISEL has sought the records and information related to his conception for a number of reasons, including, inter alia, because he is an individual who is diagnosed with a variety of severe mental health issues which are believed to have a strong genetic component, and which symptoms may be controlled, diminished, or curtailed by early diagnosis, proactive treatment, keeping track of warning signs, and taking preventative measures.

41.     The reason Plaintiff NICHOLAS ISEL was unable to obtain records and information related to his biological sperm donation was due to the destruction of the records relating to Plaintiff ISEL's biological sperm donor, which upon information and belief the Repository for Germinal Choice destroyed at or about the time the facility closed in or about 1999, when NICHOLAS ISEL was a minor of fourteen (14) years old who had no knowledge regarding his biological origins or the existence of a sperm donor, and further, as a legal minor under the laws of both Illinois and California, had no legal right to obtain any records regarding his biological sperm donor.

42. In the alternative, if the Repository for Germinal Choice did not destroy records relating to Donor Coral #36 at or about the time the facility closed in 1999, upon information and belief it destroyed such records before the summer of 2001, when Plaintiff NICHOLAS ISEL requested the records and was denied same from RGC, when he was a sixteen (16) year old legal minor.

43. Regardless of whether the Repository for Germinal Choice destroyed its records relating to the Plaintiff ISEL's semen donor in or about 1999, or otherwise prior to the summer of 2001, such destruction occurred while ISEL was a legal minor prior to the time he learned of his birth origins as a Donor-Conceived Person, whose familial medical records relating to his biological sperm donor with essential medical information were destroyed by authorization set forth within the Public Health Service Act, 42 U.S.C. 262, the pre-1997 fragmented regulatory scheme for the donor industry (described below as "FDA's 1997 HCT/Ps Documents"), and the January 19, 2001 published regulations, which ultimately were enacted as, inter alia, Title 21 Code of Regulations Part 1271.55(d)(4), effective as of January 21, 2004.

44. Donor Coral #36 was identified in a book written by David Plotz on the topic "The Genius Factory" as "Jeremy", published October 10, 2006, and has been identified to have sired at least thirty (30) donor-conceived individuals through the RGC, all of whom are genetic half-siblings to Plaintiff ISEL. Donor Coral #36 also contributed to two other sperm banks, although the number of donor-conceived individuals who may be related to Plaintiff ISEL have not been identified as he does not have access to that information.

45. NICHOLAS ISEL was interviewed by David Plotz for "The Genius Factory" book, and the author helped this Plaintiff identify his donor parent.

20

46. The first time NICHOLAS ISEL met his bio-dad Donor Coral #36 was in or about August 2003. NICHOLAS ISEL has never been informed by RGC of any family medical information it had collected from Donor Coral #36, and specifically was not made aware by RGC of his bio-dad's familial history of mental illness.

47. NICHOLAS ISEL was first made aware of his bio-dad Donor Coral #36's familial history of mental illness in or about 2005, but still lacks details that were only present in the records relating to Donor Coral #36's semen donation and within records of NICHOLAS ISEL's conception through his mother's use of such semen from the Repository for Germinal Choice.

48. Plaintiff NICHOLAS ISEL and his biological descendants have been, and will forever be, unable to know, or to provide his current and future medical and mental health professionals with, a complete picture of his familial, physical and mental health history because of the destruction by the Repository for Germinal Choice, at the direction of the FDA and pursuant to its authorization by implementing regulation, of all records relating to NICHOLAS ISEL's conception and sperm donor Coral #36 ("Jeremy") in or about 1999 when Plaintiff NICHOLAS ISEL was a legal minor with no knowledge of his status as a Donor-Conceived Person, and no knowledge of any mental illness conditions of his biological sperm donor, or in the alternative in or before 2001 when Plaintiff NICHOLAS ISEL was a legal minor who had recently learned of his knowledge as a Donor-Conceived Person, but still lacked any knowledge of any mental illness conditions of his biological sperm donor.

49. Plaintiff NICHOLAS ISEL sues as the author of a Citizen Petition filed in the FDA, on his own behalf and for similarly situated Donor-Conceived Persons within the United States, as a person who was conceived through donor gametes in or about November 23, 1984, as well as out of concern for his existing biological children who reside with him, and any future biological

descendants thereof. Plaintiff NICHOLAS ISEL has two existing biological children, the first of whom was born in 2003, and the second of whom, a minor, was born in 2010.

50. Plaintiff NICHOLAS ISEL sues as the author of a Citizen Petition filed in the FDA, on his own behalf and for similarly situated Donor-Conceived Persons within the United States, because the FDA has been delegated and maintains the sole ability under Title 21 of Code of Regulations Part 1271.55(d)(4) to regulate Establishments involved in sperm and/or egg donation ART (Assisted Reproduction Technologies), including the collection, upkeep, communication with donors/recipients of donations about updates, and retention of all relevant personal and medical information from donors and recipients, yet has failed to enact or amend regulations to take into account and protect the Constitutional and legal rights of United States citizens who are Donor-Conceived. Instead, while having actual knowing that its impermissive and unconstitutional interpretations deprive Donor-Conceived Persons of essential medical records that affect their personal and familial health, the  FDA-authorized and continues to authorize irreversible and permanent destruction of reproductive donors' vital medical and personal information contained within their regulated Establishments' Relevant Medical Record, as defined in §1271.3(s), as early as a point in time when Donor-Conceived people born as a result of these FDA regulations are a mere 9 years 3 months old, with no ability to enforce their legal rights.  The FDA continues to cause damage and loss of rights to Donor-Conceived persons every day it acts in this unlawful and unconstitutional manner.

B. The Defendants

51. Defendants are United States governmental agencies and appointed officials of the United States government responsible for the challenged actions or their successors holding

22

positions in those agencies. The individual named Defendants are sued in their official capacities and not as individuals.

52. Defendant U.S. FOOD AND DRUG ADMINISTRATION ("FDA") is an agency established within the Defendant U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS). Defendant HHS is a federal agency within the executive branch of the federal government.

53. Section 361 of 42 U.S.C. 264 of the Public Health Service Act authorizes the Surgeon General and Secretary of Health and Human Services to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases. The term "communicable diseases" is not defined within Section 361 of the PHS Act.

54. The FDA promulgated regulations in Title 21 of the Code of Federal Regulations, part 1271, regarding human cells, tissues, or cellular or tissue-based products (HCT/Ps) as part of the authority delegated to it from HHS. These regulations include reproductive cells and tissues, such as semen, oocytes, and embryos. See 21 C.F.R. 1271.3(d) and 1271.3(l). FDA generally considers reproductive cells and tissues to be HCT/Ps that meet the criteria listed in 21 C.F.R. 1271.10(a) for regulation solely under section 361 of the PHS Act and the regulations in Part 1271, as interpreted by its Guidances.

55. The FDA is the sole agency in the United States with authority to regulate the sale of human sperm and oocytes for human reproduction under 21 C.F.R. 1271, and to ensure the safety efficacy, and security of the manufacture and sale of these human reproductive biological products, which are intended for implantation, transplantation, infusion or transfer into a human recipient – all of which is done with the intention to lead to the birth of a new human being. All actions taken by the FDA to regulate reproductive gametes must be taken in accordance with

Section 361 of the PHS Act. The FDA must further ensure any actions it takes to regulate these biological products and issue Guidances to help others interpret their regulations, do not do so in such a way as to deprive the U.S. citizens who receive or are born out of these reproductive gametes intended for implantation, transplantation, infusion or transfer, of their legal rights under the U.S. Constitution, federal laws, state laws and state Constitutions.

56. Unfortunately, in enacting Part 1271 regulations, and in issuing Guidances to the Small Entity Establishments dominating the sperm donor industry, the FDA failed in its Constitutional obligations. It completely ignored the rights and interests of the millions of Donor-Conceived Persons who were birthed out of its regulations. When given a chance to fix the problems it caused as a result of its regulatory scheme, the FDA refused, and continues to refuse, to act.

57. Defendant KYLE DIAMANTAS, J.D., is sued in his official capacity as Acting Commissioner of Food and Drugs – U.S. Food and Drug Administration, and has authority and responsibility over the FDA and the activities taken thereunder. Defendant DIAMANTAS has a duty to protect the public health by assuring the safety of donor gametes intended for human reproduction as he carries out his duties with respect to drafting, interpreting and administering regulations such as those under 21 C.F.R. 1271. Defendant DIAMANTAS is the successor to former Acting Commissioner of Food and Drugs Robert M. Califf, M.D., MACC, who held this position and acted in his official capacity at all times relating to the allegations set forth within this Complaint.

58. Defendant GRACE GRAHAM is sued in her official capacity as Deputy Commissioner for Policy, Legislation and International Affairs – U.S. Food and Drug Administration, and is the successor to former Principal Associate Commissioner for Policy,

24

Lowel J. Schiller, who held this position and acted in his official capacity at all times relating to the allegations set forth within this Complaint.

59. Defendant KARIM MIKHAIL, M.S. is sued in his official capacity as Director of the Center for Biologics Evaluation and Research (CBER) – U.S. Food and Drug Administration, and as successor to former Director of CBER Peter Marks, M.D., Ph.D, who held this position and acted in his official capacity at all times relating to the allegations set forth within this Complaint.

60. Defendant OLIVIA ZIOLKOWSKI, JD, MPH, Ph.D is sued in her official capacity as Center for Biologics Evaluation and Research (CBER) Ombudsman – U.S. Food and Drug Administration, and as successor to former CBER Ombudsman, Sheryl Lard-Whiteford, who held this position and acted in her official capacity at all times relating to the allegations set forth within this Complaint.

61. Defendant ROBERT F. KENNEDY JR., is sued in his official capacity as Secretary of Health and Human Services, has authority over the U.S. Department of Health and Human Services ("HHS") and those component agencies operating under its delegated authority, including the FDA. Defendant ROBERT F. KENNEDY JR. is the successor to former Secretary of HHS Xavier Becerra, who held this position and acted in his official capacity at all times relating to the allegations set forth within this Complaint.

62. Defendant DONALD J. TRUMP is the President of the United States of America. In his official capacity, he asserts through word, deed, and Executive Order, that he bears the ultimate responsibility for all actions taken by the agencies operating under his control and delegated authority within the Executive Branch, including HHS and its component agency, FDA.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

25

A.   THE ISEL CITIZEN PETITION AND FDA ADMINISTRATIVE ACTIONS

63.     This is a challenge under the Administrative Procedures Act ("APA"), 5 U.S. Code § 701, *et seq,* 21 C.F.R. 10.45, and the United States Constitution to the denial by the Food and Drug Administration ("FDA") of a Citizen Petition, filed by Plaintiff NICHOLAS ISEL on September 15, 2016 ("Isel Citizen Petition"), as denied by Peter MARKS, M.D., Ph.D, the predecessor to the current Defendant KARIM MIKHAIL, M.S., Director of the Center for Biologics Evaluation and Research (CBER), on August 13, 2018 ("Citizen Petition Response"), along with subsequent exhaustion of administrative remedies, as set forth hereinafter and attached hereto as Exhibits A through F, inclusive.  A copy of the Isel Citizen Petition (with subsequently redacted address information) is attached as Exhibit A.  A copy of the Citizen Petition Response is attached as Exhibit B.

64.     The FDA denied ISEL's Citizen Petition ostensibly on the ground that certain records might be maintained for longer than the minimum period of 10 years, so the FDA was not concerned that their regulatory scheme destroyed many donors' records while the Donor-Conceived Persons born from donated gametes were legal minors and/or had no knowledge that they were even born from donated sperm or oocytes (eggs).  For the FDA, the possibility that records might be maintained longer meant that they were unconcerned about all of the evidence that many, many, many records were destroyed at or near the 10-year mark, based upon the direction they provided to their regulated Establishments within 21 C.F.R. 1271.55(d)(4).

65.     The FDA then took their Response further, stating that Donor Conceived Persons, such as the Petitioner (now Plaintiff) ISEL were not within the scope of intended persons it either had a duty or intention to protect when it was performing its duties as the sole regulator of the industry of "reproductive cells and tissues which, in its consideration, are HCT/Ps that meet the

26

criteria listed in 21 C.F.R. 1271.10(a) for regulation solely under section 361 of the PHS Act and the regulations in part 1271." Exhibit B at p.2.

66. The FDA, beginning its evaluation from a footnote where it admitted that the term "communicable diseases" is not specifically defined in section 361 of the PHS Act, but the FDA would interpret it for the purpose of the relevant regulation and the Citizen Petition to quite conveniently exclude the genetic diseases and conditions passed through donor gametes. Instead, it limited the definition of communicable diseases which are infectious agents or toxic products which are transmitted by those who handle the HCT/Ps. See Exhibit 2 at page 2, fn2.

67. A sperm or egg donor's reproductive gametes literally comprises 50% of the genetic makeup of each Donor-Conceived Person who eventually becomes a United States Citizen, born through the FDA regulations. The FDA provided no explanation, other than their footnoted assumption, as to why the intentionally statutorily undefined term "communicable diseases" which delegated to them the authority to regulate donor gametes for in vitro fertilization would somehow only include in that delegation the diseases that occurred outside of the womb, and not that are transmitted into the human being conceived through those regulated donor gametes.

68. While the APA requires executive agencies to follow certain processes when formulating, amending, or repealing statements of general or particular applicability and future effect to interpret law or policies, including conducting a notice-and-comment rulemaking period, 5 U.S.C. § 553(b)-(c), the FDA's footnoted assumption that it considered genetic diseases being transmitted to Donor-Conceived Persons such as ISEL to be outside the scope of its delegated regulatory authority, never went through any required rule-making process or comment period. Instead, with a footnote, the FDA excluded Donor-Conceived Persons from any regulatory benefits of Part 1271. In its Response to the Citizen Petition, the FDA concluded that "Since we do not

27

consider genetic diseases to be 'communicable diseases' within the meaning of section 361 of the PHS Act, we decline to issue regulations for the purpose of preventing the introduction, transmission, or spread of genetic diseases." Exhibit 2 at p.3. All remaining decisions to refuse to act, including to revise the records retention period, were based upon the footnote exclusion of communicable diseases.

69. The above denial of the Citizen Petition was subsequently affirmed by Lowell J. Schiller, Principal Associate Commissioner for Policy, predecessor to the Defendant GRACE GRAHAM, in her position as Deputy Commissioner for Policy, Legislation, and International Affairs, on February 28, 2020, with a written Response to the Petition for Reconsideration (hereinafter "Response to the Petition for Reconsideration, attached hereto as Exhibit D), which Petitioner had filed nearly 18 months earlier, on September 8, 2018 (hereinafter "Reconsideration Petition", attached hereto as Exhibit C).

70. The above denials were also supplemented by the denial of a Formal Dispute Resolution Request, which Plaintiff NICHOLAS ISEL submitted to the then-CBER Ombudsman, Sheryl Lard-Whiteford, Ph.D., predecessor to the current CBER Ombudsman Olivia Ziolkowski, JD, MPH, Ph.D., on March 30, 2020. A copy of this FDRR is attached hereto as Exhibit E. The FDRR was denied, without substantive comment, on July 24, 2020, by then-Commissioner of the FDA, Defendant HAHN, who has since been succeeded in that position by Defendant KYLE DIAMANTAS, J.D., who is appointed to the position as an Acting Commissioner because the agency does not presently have a permanent or confirmed Commissioner. A copy of the Denial of the FDRR, is attached hereto as Exhibit F.

71. Former Commissioner HAHN indicated the finality of his denial of Plaintiff ISEL's FDRR by stating in his July 24, 2020 denial letter that "I have determined, in my discretion, that

additional agency review is not warranted. As evidenced by the written decisions denying both your original citizen petition and your petition for reconsideration, the agency has already thoroughly reviewed your arguments and the information submitted in support." See Exhibit F.

72.   Exhibits A through F were published by the FDA on the Regulations.gov website, on the Nonrulemaking Docket, at   https://www.regulations.gov/docket/FDA-2016-P-2955 and open to the public for review of such documents, and for public comment.

73.   All documents filed by Plaintiff ISEL with the FDA, including the Citizen Petition (Exhibit A), the Petition for Reconsideration (Exhibit C), and the FDRR (Exhibit E), were filed within the time permitted by law and in accordance with all administrative regulations.

74.   During the time the Docket was open, 27 documents and supporting materials were filed by the FDA and/or Petitioner.   For the Isel Citizen Petition (Exhibit A), there were 73 Public Comments, all of which are incorporated by reference herein as Group Exhibit G; for the Petition for Reconsideration (Exhibit C), there were 241 Public Comments, all of which are incorporated by reference herein as Group Exhibit H. Public Comments and any attachments they uploaded with their Comments, as incorporated as Exhibits G and H, may be viewed at https://www.regulations.gov/docket/FDA-2016-P-2955.

75.   All of the Comments filed on the ISEL Citizen Petition became a part of the administrative record, to be considered by the Commissioner in making its decision on the Citizen Petition pursuant to 21 C.F.R. § 10.30(d), § 10.30(i)(2), § 10.30(j), and were important information conveyed to the FDA for use during its decision-making process. Some Public Comments are highlighted here:

29

a. On October 26, 2016, Damian Adams filed a Public Comment.[11]

Existing records should be mandatorily maintained for a minimum of 50 years but preferably indefinitely. I have attached a file containing arguments to support this position.

The attached document read as follows:

FDA Petition for the Mandatory Storage of Donor Conception Records
To whom it may concern,

All existing records and future records relating to a donor conception procedure, the donor, or any documents that may link records or are in any way associated with these records must be kept indefinitely and protected from destruction. These records should not remain the sole property of the fertility treatment clinic, rather they must be protected through digitization, stored in a central national repository, entered into a national database and backed-up to protect against accidental loss/destruction. This builds redundancy into the system, thereby ensuring the safety of the records. As Americans potentially shift states and there are records of donors donating in multiple states, a national database is the logical solution. Additionally, as gametes have been transported between clinics of different states, it is vitally important that a national database of records be available to ensure that all parties involved in donor conception are able to access these records/information as required.

The mandatory retention of records serves numerous purposes. From a clinical perspective it ensures that clinics can keep track of their donors and the people they have assisted with their gametes. This can assist in restricting the number of offspring created from the one donor. The ASRM (American Society for Reproductive Medicine) recommended that the number of offspring be limited to 25 in a population of 800,000, mainly to prevent the occurrence of a consanguineous event. However, the Donor Sibling Registry has linked groups of offspring to individual donors in which the numbers of siblings in these groups has numbered over 200, suggesting that the concern for consanguinity has not been at the forefront for some clinics as much as it should be.

That also does not take into consideration what it is like for these people to be in a family that numbers over 200 siblings and how they are to not only emotionally deal with such a situation that has never existed before in human

---

[11] Public Comment ID: FDA-2016-P-2955-0010, received October 26, 2016; posted December 6, 2016. Reprinted verbatim and with original formatting, with knowledge and permission of Damian Adams.

30

society; but also now that they are creating links, how are they to navigate relationships with so many siblings.

To prevent a consanguineous relationship from occurring these offspring currently have to ask potential partners if they too are donor conceived and if so, determine if they have the same donor. This can only occur if the offspring are aware that they are donor conceived. With research showing that the majority of offspring are not informed of their conception because the parents wish to keep it a secret, many of these offspring are unable to prevent the possibility of a consanguineous event from occurring. While such events are often stated to be highly unlikely we are already aware of at least one such case occurring that has been reported in the media in which two donor conceived siblings got married without knowing that they were indeed siblings. As most people would not want to make such news public, we can only assume that this would not be the sole case of consanguinity involving donor conceived siblings. The shock and trauma associated with this must be terrible and currently not enough effort is being put in place to prevent this from occurring. It is certainly a concern for many donor conceived people as it is something that is raised in many online discussion groups and meetings.

Certainly the issues with record keeping are not restricted to consanguinity. A vitally important part of record keeping is the access to medical information. While donors are tested for certain conditions they are certainly not tested for the majority of conditions that may affect a person nor for various recessive disorders that they may be a carrier of. Donor offspring must be able to access such information as they age. Many conditions may not arise until well after 10 years of age when the records may currently be destroyed. Unfortunately records and health histories are rarely updated so that offspring can access updated medical information on their progenitor. Any person who lacks knowledge of their medical history has been described by the Centers for Disease Control and Prevention as having serious implications for early diagnosis. Subsequently this may affect their life-style choices in which appropriate knowledge can help prevent the onset of various diseases such as type-2 diabetes and heart disease. Life-style choices that not only reduces the medical burden on the individual but also the medical welfare system. Reports of how this can adversely affect a person's health prospects were highlighted in the Victorian Law Reform Committee's inquiry in Australian, which showed that in 2011 there were 3 incidences of a donor or donor conceived person unable to pass on medical information to those directly affected and in one instance a person was diagnosed with a terminal illness that possibly could have been screened and treated at an earlier stage if a health history was available.

The benefits of access to medical information records is not restricted to the donor conceived person, but also includes the donor and their family (as

31

information from an offspring may assist their own family), but also the families of other offspring that may be equally affected. A central register of records that includes medical information which can be updated and also accessed by all parties is therefore essential to the welfare of all involved.

Such medical information and treatment records is also pertinent to clinical practice. The techniques used in clinical practice have changed over the decades. Appropriate record retention would allow for scientific analysis to determine not only success rates of live births, but also the health of offspring. I have published peer reviewed research that was a systematic review of existing published evidence by other researchers including ASRM reports which showed that people conceived with donated eggs have worse perinatal outcomes which then have the potential to influence their health trajectories into adulthood. As a scientist, data linkage with record collections allows researchers like myself to better analyse various treatments and work out what methodologies provide the best outcomes for the patients and the children created.

The retention of records also assist those people who wish to connect. While a system of donor/recipient anonymity is still prevalent in the USA, there has been an increasing demand for donors who are willing to be known, and also an increase in the number of donors willing to be known. Research has shown that many offspring wish to know about, as well as potentially connect with the donor, in addition to knowing who their siblings are. This is also supported by research of donors who have also shown an increase in openness to identification and contact over time. Subsequently, the retention of records only further assists these connections to be made. Currently, all members of the donor conception community are having to rely on voluntary databases such as the Donor Sibling Registry or Donor Children to try and make these connections. Additionally some are even submitting their DNA for analysis in an attempt to answer these questions. A central database that contains digitized files can assist connections for those that are willing for these connections to be made.

Donor conception records therefore contain vital information for not only the donor conceived person, but also provide important potential links for the donor and other siblings. Furthermore, these records provide essential information for clinical practice and scientific evaluation. It is therefore imperative that they kept for a minimum of 50 years if not indefinitely.

Damian Adams
Medical Research Scientist
Peer reviewed author of research journal articles on donor conception who has provided evidence on donor conception practice before governmental inquiries in Australia.

32

    b.   On December 13, 2016, Linden Isel filed a Public Comment.[12]

10 years is no where near enough time to retain records of family medical history; how do we expect to limit the spread of physical & mental health issues with a clear genetic predisposition if we don't hold records for more than a decade?

    c.   On October 27, 2018, Cassandra Adams filed a Public Comment.[13]

I am a donor conceived adult. I found out 13 months ago, right before I turned 35, that my parents had used an anonymous sperm donor to conceive me in 1982. My discovery was made via DNA testing, which revealed unexpectedly ethnicity (50% Ashkenazi Jewish) and a half sibling match. I have spent the last year immersed in researching the history of donor conception, learning about the ethical concerns, telling everyone I can about the predicament and lost rights of donor conceived people, preaching current best practices, advocating for more transparency in the industry, and interacting with more donor conceived people, recipient parents, and donors than I can count. We need this legislation, badly. I have never seen so much trauma or inhabited a world like this with so many people on all sides of the practice suffering because of the need for these regulations. We need an end to anonymity officially. After I found out I was donor conceived, I was able to find the basic identity of my biological father within about 72 hours of my discovery. This was after 35 years, with ZERO records. All through DNA testing. Not only were my parents never given any information about the donor, no paperwork, no records, but they were given only the reassurance he was a 'healthy doctor.' Upon talking with my biological father, I learned that the donors at the time were asked NO health questions. At all. No health history was taken, and certainly none passed on to my parents, and certainly nothing documented in writing, and last of all, nothing given to me. Not even the dignity or to my own body and my own health. What a blow to my sense of trust and humanity. Medical decisions such as medication choices and testing procedures were often based on my dad's medical history, which had no genetic impact on me. Anonymity makes it easier to perpetuate these lies. These lies, and lack of accurate medical information, will no doubt end up costing Americans more and more money in lost healthcare costs as donor conception rates increase. By accepting the petition here, you obtain accurate records. You keep accurate records for longer. You get updated health history throughout the lifespan. Donors will understand more of what is needed of them. Donor conceived people can be healthier, and grow up knowing more information and having more access to the men and women who make up half of their DNA. The people who helped give them life, their biological parents.

---

[12] Comment ID: FDA-2016-P-2955-0017, received December 13, 2016; posted December 14, 2016. Reprinted verbatim and with original formatting, with knowledge and permission of Linden Isel.

[13] Comment ID: FDA-2016-P-2955-0096, received October 27, 2018; posted October 31, 2018. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

Everyone wins. The FDA website, on the page covering Reproductive Tissue Donation, you tout that the FDA is responsible for regulating human reproductive tissues. You state, "these records include...donor medical history interview to determine medical history...physical examination, and treatments related to medical conditions." You specifically give yourself jurisdiction over broad MEDICAL HISTORY. Medical history includes illnesses both hereditary and communicable. If you give yourself jurisdiction, on your own website, of keeping track of donor medical history, then you have the responsibility to uphold the safety and health of the people created using the donated gametes that you regulate. You have the responsibility to keep track of all aspects of medical history - INCLUDING genetic and heritable conditions - and keep those records for an appropriate amount of time. Considering that many donor conceived people do not find out about their true parentage until they are adults, this information can prove vital, and 10 years is not NEARLY enough time. Anonymity can no longer be maintained with commercial DNA testing, and it is misleading to donors and parents, and harmful medically and psychologically to donor conceived people. We want the same rights to knowledge as our counterparts in the world of adoption. Please do not allow the Big Fertility money machine to cloud over the job you have to do for the health and well-being of American citizens -- human beings with the same rights as those conceived naturally. While we are working on reforms on a state by state level, because of the interstate nature of this industry, your federal jurisdiction is key toward making the world of ART safer in the future. I am fortunate to have been welcomed by my biological father. I am fortunate to have answers. I am fortunate not to carry any of the Ashkenazi gene mutations that could have proved dangerous had I unknowingly passed them onto my child. I am fortunate to have my TRUTH. All donor conceived people deserve that. Please accept the petition. Thank you.

    d.   On November 13, 2018, Amber van Moessner filed a Public Comment.[14]

The reproductive medicine industry is widely and unethically unregulated. Donor conceived people have a right to their health records and any information that may be life-saving down the line. These medical practices are unique in that the person affected most cannot consent to them, and therefore should have some recourse to find out more information as an adult, which is currently impossible for most. The FDA needs to consider this petition.

    e.   On February 8, 2019, Anonymous filed a Public Comment.[15]

---

[14] Comment ID: FDA-2016-P-2955-0103, received November 13, 2018; posted November 14, 2018. Reprinted verbatim and with original formatting, with knowledge and permission of Amber van Moessner.

[15] Anonymous Public Comment ID: FDA-2016-P-2955-0124, received February 8, 2019; posted February 21, 2019. Reprinted verbatim and with original formatting.

I support this petition wholeheartedly. Nations such as Australia and the United Kingdom have already taken action to regulate the fertility industry, to significant positive results. The fertility industry should be held to the same standards as the rest of the medical field and be regulated by the FDA to prevent abuse and the spread of genetic disease. If the individuals who result from the direct actions of this industry (i.e. individuals such as Mr. Isel and myself) are the ones asking for regulation and change, then who can say that these issues are unimportant?

There are too few ethics and too much profiteering involved in the current fertility/reproductive assistance industries in the United States. There have been instances of doctors using their own genetic material (read: sperm) to impregnate patients without those patients' knowledge. There have been instances of clinics not screening their donors thoroughly (as yet there is no specific requirements they are legally required to meet in regards to the overall mental and physical health of their donors) and the resulting children (and eventual adults) created by those donations are left to suffer with no foresight into these inherited health issues. Genetic health information is not only kept from donor conceived individuals, but several donor conceived individuals have been threatened with legal action when they inquire about potential health risks at the clinics that created them. There have been instances of clinics producing over 50 children from a single donor's sperm, which is currently legal, but morally bankrupt and can cause significant mental damage to the resulting individuals who later in life may have to deal with feelings of dehumanization or commodification. Not only that, but imagine the possibilities when you combine this mass-production with lax screening processes. The Federal Government may well end up having to care for and/or pay for the healthcare of over 50 disabled or sick individuals if a genetically unwell donor is (very easily) able to slip through the Fertility Industry's unregulated cracks. No matter how you look at this situation, it is clear that the fertility industry has committed some truly unethical grievances under its own oversight and taken health risks for individuals without their consent. It is also clear that as long as there is a profit to be made, this industry will continue these practices unless the FDA steps in and creates guidelines to prevent them. In the rest of the medical profession, we do not simply ask doctors to "Please, do the right thing." We have strict laws and guidelines, that when violated result in malpractice suits, fines, loss of medical licenses, and, in extreme cases, jail or prison time.

In summary, it has become painfully obvious over the last 50 years or so that the fertility industry is absolutely incapable of governing themselves. Left alone, they will continue to make their profits at the direct cost of not just the individuals they create, but also to their patients who have often been intentionally deceived on many different levels themselves. This industry does not care if it creates healthy children or if it creates the next spike in a genetic disease for which they did not wish to pay to screen their donors. The only thing they care about is their bottom

35

line. This industry NEEDS regulation, and the private citizens who find themselves involved in and/or harmed by this industry desperately need the intervention of the FDA.

Thank you for your time and consideration.

    f.  On February 27, 2019, Alissa Beuerlein filed a Public Comment.[16]

Donor conception must be regulated! I am a DC person and it has affected me deeply not knowing who my biological father is. People deserve to know who their biological parents are.

    g.  On March 2, 2019 Erika Wiley filed a Public Comment.[17]

As a mental health professional, I view the right to identify as a crucial element in formation of identity, beliefs and self narrative, and for over all mental health well being. Increasing record retention rates and ending donor anonymity are two hurdles that need to be eliminated in order achieve the right to identity. Its time for the needs of the donor conceived offspring to be put first in determining best practices.

    h.  On March 13, 2019, Loretta Evans filed a Public Comment.[18]

I am DCA born 1978. In Hartford, Ct. Only info I know is the blood type of my donor had to be RH- to be compatible with my mom. I am also RH - So I have a different donor than my older brother. I found out this information at age 38. I was supposedly the last donation from the "intern, med student, or resident". I found a brother from the same donor who did not know he was donor conceived. He is 6 months younger than me. I was denied my true medical history believing the man who signed my birth certificate was my biological father. There were no notations stating otherwise. I have a rare kidney disease/disorder that less then 3 percent of the worldwide population have been diagnosed with. I have MSK (Medullary Sponge Kidneys) and Nephrocalconis. It is not in my maternal side of the family. But with such few cases, not much is known. I have to see a Nephrologist at NYU who has been studying this and helping others understand. He does not have a published resource yet and is working on a study to see if there is a DNA marker for it.

---

[16] Comment ID: FDA-2016-P-2955-0137, received February 27, 2019; posted March 1, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Alissa Beuerlein.
[17] Comment ID: FDA-2016-P-2955-0144, received March 2, 2019; posted March 5, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Erika Wiley.
[18] Comment ID: FDA-2016-P-2955-0277, received March 13, 2019; posted March 21, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Loretta Evans.

Here is a resource to see some info.

https://kidneystones.uchicago.edu/the-diagnostic-dilemma-of-medullary-sponge-kidney/

I personally am a professional kidney stone producer and there is no cure. Luckily mag scans have shown I have kidney function, so a transplant is not an option. I have enclosed attachments which are stills from one of the monthly CT SCANs I averaged at ers before I found my Nephrologist at NYU. The stills show my kidneys and the hundreds of thousands of stones currently in my right kidney alone. I experience chronic, disabilitating pain.

Had I had a true record of my family medical history, I may have known if kidney issues run in my biological family. Or genetic counseling during 2 of my 3 children would have gone completely different! I may not have insisted my family history was my deceased father, whom my mother divorced when I was a baby.



My children are also entitled to a family medical history, which I cannot provide.

    i.    On March 18, 2019, Cassandra Adams filed a Public Comment.[19]

These genetic diseases and conditions are communicable - they are passed from person to person, in our cells, our very DNA, based on biological parentage. This type of health information and protection is under your jurisdiction, for the well-being of American citizens. Donor-conceived people are not a sub-class of people for whom these protections do not apply. And anything listed in these comments just scratches the surface of what is out there. People usually have a few children, not hundreds. Without testing we are putting a lot of chance into people having little to no idea where they come from and what their risks are. Most people take that for granted when they go to the doctor and fill out forms. Gamete donors are biological parents, and their health history is forever tied into the health of us, their donor-conceived children, and our descendants. Not to mention that there are definite connections between genetics and mental health and wellness, and

---

[19] Comment ID: FDA-2016-P-2955-0286, received March 18, 2019; posted March 21, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

with issues of genealogical bewilderment (as seen in the adoption community) and dysfunction from being in-between our raising and biological families, we are also at greater risk of suffering. We need more studies done on our psychological well-being as well. Secrecy needs to end, as the trauma associated with it is destroying the families it was intended to create and causing countless cases of PTSD and CPTSD. We need to know the mental and physical health history of our families in order to properly treat ourselves. It will save on healthcare costs in this country, and provide more accurate and targeted and preventative care. We need our records kept in this age of technology, where records can be kept indefinitely on databases and in the virtual world. It is possible and simple. Transparency is the legacy we wish to leave; join us on the right side of history. Thank you again.

    j.   On March 18, 2019, Cassandra Adams filed a Public Comment.[20]

We need our medical history. If some banks can do extensive testing for chromosomal and genetic conditions that could be passed along to not just a few, but hundreds, of offspring because limits on number of children produced is something that is also not effectively regulated then it is something that is possible to do across the board. Why cant this be mandated? Some banks can do these tests. Some banks can limit siblings. Some banks can manage to only use willing-to-be-known donors. Why cant these be mandated? The possibility exists. The ability exists. The will has to exist. For the donor-conceived community, that determination exists. We will get every state on board. We will change the system just as adoptees are changing the system, and just as other marginalized groups before us have done. I am working in New Jersey. We already have legislation in the works. We already have politicians, activists, and health professionals on board. We will succeed and we need the help of the FDA to bolster our efforts. Genetic diseases are passed down. They are communicable. I am part of a group of adults finding out they have significant Ashkenazi Jewish ethnicity later in life. One of our first priorities is genetic testing to look for the diseases so common in the endogamous community we come from. My first concern was cancer, breast cancer/BRCA especially, but there are so many more:
Diseases Common to all Jewish Groups
Cystic Fibrosis
Familial Mediterranean Fever
Fragile X Syndrome
Glycogen Storage Disease Type II
Phenylalanine Hydroxylase Deficiency
Retinitis Pigmentosa 28
Smith-Lemli-Opitz Syndrome
Spinal Muscular Atrophy

---

[20] Comment ID: FDA-2016-P-2955-0285, received March 18, 2019; posted March 21, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

Tay-Sachs Disease

Wilson Disease

Ashkenazi Jewish Diseases

3-Phosphoglycerate Dehydrogenase Deficiency

Abetalipoproteinemia

Alport Syndrome

Arthrogryposis, Mental Retardation and Seizures

Bardet-Biedl Syndrome

Bloom Syndrome

Canavan Disease

Carnitine Palmitoyltransferase ll Deficiency

Choreoacanthocytosis

Congenital Amegakaryocytic Thrombocytopenia

Congenital Disorder of Glycosylation la

Cystic Fibrosis

Deafness-Autosomal Recessive 77

Dyskeratosis Congenita, Autosomal Recessive

Ehlers-Danlos VllC

Enhanced S-Cone Syndrome

Factor XI Deficiency

Familial Dysautonomia

Familial Hypercholesterolemia

Familial Hyperinsulinism

Familial Mediterranean Fever

Fanconi Anemia-Group C

Fragile X Syndrome

Galactosemia

Gaucher Disease

Glycogen Storage Disease 1A

Glycogen Storage Disease Type II

Glycogen Storage Disease Type IV / Adult Polyglucosan Body Disease

Glycogen Storage Disease Type VII

Hermansky-Pudlak Syndrome 3

Joubert Syndrome 2

Lipoamide Dehydrogenase Deficiency

Maple Syrup Urine Disease 1B

Mitochondrial Complex 1 Deficiency

Mucolipidosis IV (ML4)

Multiple Sulphatase Deficiency

Nemaline Myopathy 2

Niemann-Pick Disease Type A/B

Nonsyndromic Hearing Loss

Osteopetrosis 1

Phenylalanine Hydroxylase Deficiency

Polycystic Kidney Disease, Autosomal Recessive
Pontocerebellar Hypoplasia Type 1A
Primary Ciliary Dyskinesia DNAH5
Primary Ciliary Dyskinesia DNAI1
Primary Ciliary Dyskinesia DNAI2
Primary Hyperoxaluria Type 3
Retinitis Pigmentosa 28
Retinitis Pigmentosa 59
Smith-Lemli-Opitz Syndrome
Spinal Muscular Atrophy
Tay-Sachs Disease
Tyrosinemia-Type 1
Usher Syndrome-Type IF
Usher Syndrome-Type III
Walker Warburg Syndrome and Other FKTN-Related Dystrophies
Wilson Disease
Zellweger Syndrome Spectrum-PEX2
Sephardi-Mizrahi Jewish Diseases
3-Methylglutaconic Aciduria, Type III / Optic Atrophy 3, with Cataract
Acute Infantile Liver Failure
Adrenoleukodystrophy-X-Linked ABCD1
Asparagine Synthetase Deficiency
Ataxia Telangiectasia
Beta-Globin-Related Hemoglobinopathies
Cerebrotendinous Xanthomatosis
Chronic Granulomatous Disease
Congenital Insensitivity to Pain with Anhidrosis
Congenital Myasthenic Syndrome
Corticosterone Methyloxidase Deficiency
Cystic Fibrosis
Cystinosis
Familial Mediterranean Fever
Fanconi Anemia-Group A
Fragile X Syndrome
Glycogen Storage Disease Type II
Glycogen Storage Disease Type III
Glycogen Storage Disease Type V
Hereditary Spastic Paraparesis 49
Homocystinuria due to MTHFR Deficiency
Inclusion Body Myopathy 2
Infantile Cerebral and Cerebellar Atrophy
Leber Congenital Amaurosis 2-Retinitis Pigmentosa 20
Limb Girdle Muscular Dystrophy Type 2B
Megalencephalic Leukoencephalopathy with Subcortical Cysts

Metachromatic Leukodystrophy
Microphthalmia / Anophthalmia
Mitochondrial Complex 1 Deficiency
Mitochondrial Myopathy and Sideroblastic Anemia
Myoneurogastrointestinal Encephalopathy
Omenn Syndrome
Ornithine Aminotransferase Deficiency
Phenylalanine Hydroxylase Deficiency
Polyglandular Autoimmune Syndrome, Type I
Pontocerebellar Hypoplasia Type 6
Progressive Cerebello-Cerebral Atrophy
Renal Tubular Acidosis and Deafness
Retinitis Pigmentosa 25
Retinitis Pigmentosa 26
Retinitis Pigmentosa 28
Smith-Lemli-Opitz Syndrome
Spinal Muscular Atrophy
Tay-Sachs Disease
Usher Syndrome-Type IIA
Wilson Disease
Wolman Disease / Cholesteryl Ester Storage Disease
Zellweger Syndrome Spectrum

    k.   On June 17, 2019, Cassandra Adams filed a Public Comment.[21]

This is a personal story about the importance of proper mental health care and accurate medical history in children, which I wrote in reaction to an article detailing that most parents are unaware that their teenagers contemplate suicide.

When I was 15, I hit the point where couldnt hide my depression & anxiety disorders anymore. When my parents brought me to the psychiatrist, he asked about family history of mental illness. After giving his own troubled mental health history, my (nonbio) dad recounted that my grandmother had had severe postpartum depression, was institutionalized, and had horrific ECT. I had never known that before, it shocked me, broke my heart, and angered me to hear it in this context. Years later, I would needlessly worry what would happen after I had my daughter. My mothers family has a history of undiagnosed anxiety disorders. The psychiatrist suggested that, since my dad was being treated with medication for his psychiatric conditions, we might have luck trying the same medications on me, being his daughter. And so began my long journey on Zoloft. It didnt work.

---

[21] Comment ID: FDA-2016-P-2955-0306, received June 17, 2019; posted June 18, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

But the doctor kept me on it, increasing the dosage, sure that if he kept me on it longer, it would have an effect. It worked for my father, after all. He kept me on it much longer than he otherwise would have. Instead of trying another antidepressant, he tried augmenting it with Wellbutrin, Risperdal also a medication he used because it worked for my dad, to which I did not respond well at all. None of this helped. I continued to suffer. I had to leave school and rely on home tutors. One night, I wanted it to end. The intent was there, the pain was there, but the modality (thankfully) wasnt. The attempt led to a many-years battle with cutting. Because of waiting for the medication to kick in. To ease this sense that I was completely wrong for this world, this disgust with myself, and to end the crushing burden of why I should exist at all.

As it turns out, my parents lied to that psychiatrist. The paternal medical history they provided and relied on was not my actual medical history. Now, my dads mental health history affected me due to growing up with him; lies led to trauma and maladaptive behaviors being modeled. Yet, my actual biology, the medical history built into my body, the medications I am predisposed to respond to, has nothing to do with him. My parents sat by and let my psychiatrist make repeated medication decisions based on information that they knew was not applicable to me. I consider it neglect, abuse. It was intentional. I was 15, severely ill, unable to care for myself, and relying on them for my health and safety. I tried to kill myself. All parents make mistakes, but his choice to lie almost cost me my life and almost cost them the child they so desperately wanted. Egos and the lies were more important than my life. I am left to truly bear the weight of it. When I look at my true background, my personality and struggles make sense, finally. Growing up, as loving as my parents could be, there was an air of - difficult things arent talked about. No one knew how to guide me, how to help me express emotions. It turns out, there was so much unexpressed. Pain, secrecy all kept quiet. And a part of me that felt so out of place in the world. The problem with our situation is that we have that feeling, we dont know WHY, because we are being lied to and gaslighted about so many aspects of who we. It can lead to deeply unsettled feelings. Doctors always wondered what my trauma was, and now, to a much larger extent than I could have imagined then, I know. It was both lucky and unlucky that mental health was on the radar in my family of origin. I have three sides to contend with.

Three-quarters of parents said they had no idea their children had recurrent thoughts about death. We want our kids to be able to say, Hey, Im not OK. My parents certainly did not know about my attempts on my life, or the extent of my turmoil. At least now I know from where, and why, I have in the past, and now, go through what I do. When young kids have strong emotions, they need to help process and express what they feel, not to live in a circus of emotional and medical secrecy. I learned to hurt myself out of the hatred I had for not being able to be who I truly was. Children need parents to be their safe, open place.

42

Honesty and having accurate medical history could save their lives. I wanted to tell this story as a cautionary tale. I want other people to learn how serious this world is. When they say secrets are toxic, this is what they mean.

After a few more medications, I started to respond to Paxil. I believe, in some way, that I didnt die then so that I could learn the secret of my life - and sign THIS. If I was destined never to have learned it, I dont know that I would want to live. I want my dignity the dignity and humanity I never felt like I had, for which I achingly longed, which I would have died to achieve.

l. On October 23, 2019, Jody Madeira filed a Public Comment.[22]

I am writing in support of Petitioners Petition for Reconsideration. As a law professor with a research focus in reproductive medicine, I have read and taught cases where gamete banks misrepresent donor characteristics, fertility clinics fail to engage in proper genetic testing of donors and intended parents or negligently transfer the incorrect gametes. Whether the result is life-threateningthe discovery that a donor-conceived child has cystic fibrosisor distressingthe sudden knowledge that your children are a different race or ethnicity than that of the chosen donor, learning that ones family-building choices were never honored is tragic. The harms involved in these cases are palpably obvious. When patients become plaintiffs and seek legal damages from banks or clinics, however, the vast majority of courts have denied recovery for the intended parents distress on the grounds that a childhealthy or otherwiseis not a harm. While concern for the effects of such lawsuits on donor-conceived children is laudable, such outcomes also disincentivize banks and clinics to comprehensively reform their practices and protocols to avoid such incidents. The FDA's actions cannot alter the unfortunate outcomes in these lawsuits. But it can have play a crucial role in protecting donor-conceived individuals in other ways. Currently, after 10 years, the very medical records that could help answer sundry questions of fundamental importance can be destroyedalong with any evidence of the clinics conduct.

At this point, medical records are more important than ever before. This, after all, is the era of the direct-to-consumer genetic test, a technological innovation that thoroughly undermines guarantees of anonymity. Whennot ifdonor-conceived individuals learn of their origins, it is cruel to deprive them of their only means of obtaining medical histories. There are clearly other issues at stake here, beyond the scope of this petition, such as the need to shift from anonymity and a donors rights perspective towards a third-party reproductive ethic focused on a child welfare model. However, when this cultural and regulatory shift begins to occur

---

[22] Comment ID: FDA-2016-P-2955-0323, received October 23, 2019; posted October 28, 2019. Reprinted verbatim and with original formatting, with knowledge and permission of Jody Madeira.

(as it has in several highly developed Western countries), the FDA needs to be ready with a forward-thinking regulatory scheme. A 10-year records retention requirement fosters negligence, encouraging industry actors involved in third party reproduction to delay suit and obfuscate. A 50-year retention requirement, on the other hand, provides donor-conceived individuals with a much-more realistic chance of uncovering the circumstances of their conception, including genetic conditions. A longer records retention period would also free up sorely pressed judicial resources and guarantee a more uniform result than adversarial litigation. Finally, it would also allow donor-conceived individuals to press forward and adjust to their known identities without being weighed down and overwhelmed by awful questions of not knowing and frustration with an opaque system in which they seem to have few (or no) rights.

    m.  On February 3, 2020, Cassandra Adams filed a Public Comment[23].

"'Where you came from informs who you are, and every New Yorker deserves access to the same birth records it's a basic human right,' Governor Cuomo said. 'For too many years, adoptees have been wrongly denied access to this information and I am proud to sign this legislation into law and correct this inequity once and for all.'"

Last month, on January 15, 2020, adult adoptees born in New York State were finally given unrestricted access to their original birth certificates. The work to get there was astronomical, and, no doubt, excruciatingly painful. New York became the 10th state to open original birth certificates for adoptees. We as a nation are beginning to understand that having this access to documents about ourselves is a basic human right.

I too was born in the state of New York, in 1982. Yet, I have no documents to even access about my origins; they don't exist. There is nothing in writing to indicate that I was created through a medical procedure to be half adopted. There are NO records that clarify my birth. Forget about ACCESS to that information, for many of us, NONE even EXISTS. The statement above from Gov. Cuomo hurts my soul, it causes scrapes to burn anew. Basic human rights are denied so many of us, rights that the United Nations deems essential for people to have: records of our IDENTITY.

On this historic day for adoptees in New York, those of us conceived via 'donors' can't help but be reminded how far we have to go: as I stated, many of us have NO records AT ALL to open up that document our origins. Even now, you as the FDA only mandate that fertility records legally need be maintained for 10 years.

---

[23] Comment ID: FDA-2016-P-2955-0326, received February 3, 2020; posted February 5, 2020. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

44

ONLY TEN YEARS. When adoptees' original birth certificates are maintained for them to have access. States are informed by the federal; we need the federal to mandate that donor-conceived people ALSO have records maintained to access critical information about our identities. We are, in effect, half or fully adopted and being raised by non-genetic parents just like traditional adoptees. In summary:

My origins are a secret. My identity is a secret. I am a secret.

I have no rights and nothing to access.

The only documentation i have is in the cells of my own body.

Give us reliable access to our own records.

(https://www.nydailynews.com/news/politics/ny-adoptees-access-to-birth-certificate-eighteenth-birthday-new-york-20191114-xqjhowhpgrhkhjuchxvc6bpnku-story.html?fbclid=IwAR1I8g6Gop5Agt4kN8OoH6GtclGtSsWgBKSir7-akdSQ4jR5GDUrw_8Fv-I

    n.   On February 3, 2020, Cassandra Adams filed a Public Comment.[24]

See attached file(s)

**UNITED NATIONS #CRC30: RECOMMENDATIONS ON DONOR CONCEPTION & SURROGACY**

"There is a need for urgent national and international measures, which are inclusive of and made in consultation with a broad representation of donor-conceived and surrogacy born persons. These voices need to be heard, listened to and acted upon.

States should create international and national frameworks and laws that:

1) Ensure the right of donor-conceived and surrogacy born children to **access information about their identity and origins** regardless of when these children were conceived and born and to preserve relations with their biological, social and gestational families.

2) Ensure that comprehensive and complete records of all parties involved in the conception of the child be **held by** the State in perpetuity for future generations.

3) Respect and **promote the full and effective enjoyment of all the rights** of donor-conceived and surrogacy-born children in both the immediate and longer terms.

4) Ensure that the **best interests of the child be paramount** consideration in all relevant laws, policies and practices and in any judicial and administrative decisions. This requires a best interests assessment pre-conception on an individual case by case basis.

5) **Prohibit all forms of commercialisation** of gametes, children, and surrogates including but not limited to, the sale and trafficking of persons and gametes."

Recommendations issued by Working Group 6 at UN Child Rights Convention Conference #CRC30, November 20 2019

#donorconceived #CRC30 #ChildRights30 #WorldChildrensDay

---

[24] Comment ID: FDA-2016-P-2955-0327, received February 3, 2020; posted February 5, 2020. Reprinted verbatim and with original formatting, with knowledge and permission of Cassandra Adams.

Even if the United States has not signed the United Nations Declaration on the Rights of the Child, we can still work toward the UN recommendations linked to below. Increasing record retention time and abolishing anonymity would be HUGE steps. Help us work on human rights and move toward a more progressive future in the area of 'donor' conception, the way many other countries have.

76.     The above Exhibits A through H, inclusive, set forth the sum total of Administrative Remedies which were sought by Plaintiff NICHOLAS ISEL but denied herein from the FDA, and all such administrative remedies were fully exhausted by Plaintiff NICHOLAS ISEL herein based upon then-Commissioner HAHN's statements in denial of the FDRR, See Exhibit F.

77.     The FDA's lengthy delays over the course of the exhaustion of administrative remedies for the Isel Citizen Petition occurred at the same time the FDA was conducting hearings as to how it would allow Citizen Petitions to be used when they involved a request for any form of action relating to a pending abbreviated new drug application (ANDA), 505(b)(2) application, or certain applications submitted under the Public Health Service Act (PHS Act).   These discussions did not involve Citizen Petitions to be filed by actual United States Citizens, or anyone not involved in the pharmaceutical industry.

78.     A Citizen Petition is a process provided by the United States Food and Drug Administration, and set forth in 21 C.F.R. Part 10, intended for individuals and community organizations to make requests to the FDA for changes to health regulations, policies and/or Industry Guidance implemented by the Agency.

79.     Although Citizen Petitions were originally intended for use by individuals and community organizations, the majority of Citizen Petitions  during the time the ISEL Citizen Petition was pending were filed by  or on behalf of Pharmaceutical companies.

80.     Upon information and belief, the only Citizen Petition filed by an individual person at any point between September 15, 2016 and the present which was followed by a timely filed

46

Request for Reconsideration, a timely filed Formal Dispute Resolution Request, and exhaustion of administrative remedies within the FDA, is the Isel Citizen Petition.

81.     Upon information and belief, this is the only Citizen Petition seeking Judicial Review which does not relating to a pharmaceutical product or the pharmaceutical industry.

82.     Upon information and belief, this is the only Citizen Petition ever filed which seeks to protect the rights of United States Citizens conceived and born as a result of FDA regulations.

### B.  LEGAL AND REGULATORY BACKGROUND

83.     Section 361 of 42 U.S.C. 264 of the Public Health Service Act authorizes the Surgeon General and Secretary of Health and Human Services to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases.

84.     The term "communicable diseases" is not defined within Section 361 of the PHS Act, and therefore the term is not limited by a strict definition, but instead by achieving the purpose of the Regulations promulgated thereunder.

85.     The FDA's self-described vital mission is to protect and promote public health, and the FDA is responsible for ensuring the safety, efficacy, and security of, *inter alia*, biological products.

86.     The FDA is the only federal agency in the United States to which Congressional power has been delegated to regulate the sale of human reproductive cellular and tissue-based products.

87.     Human Cells, Tissues, and Cellular and Tissue-Based Products, commonly referred to as HCT/Ps, are articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient.

88.     Prior to 1997, the regulation of HCT/Ps was highly fragmented.  In 1997, the Food and Drug Administration announced its plans for the regulation of HCT/Ps per the delegation of authority from the HHS Secretary, in two documents: "A Proposed Approach to the Regulation of Cellular and Tissue-Based Products" (62 FR 9721, March 4, 1997) and "Reinventing the Regulation of Human Tissue" (hereinafter jointly  "the FDA's 1997 HCT/Ps Documents").

89.     On January 19, 2001, FDA issued regulations pursuant to the delegation of authority from HHS, to create a new unified system for registering HCT/P establishments and for listing their HCT/Ps.  Those regulations at issue in this Complaint ultimately became effective on January 21, 2004 as Title 21 C.F.R. Part 1271.

90.     As noted in the publication by the FDA called Guidance for Industry, Regulation of Human  Cells, Tissues and Cellular and tissue-Based Products (HCT/Ps), Small Entity Compliance Guide, the regulations set forth in 21 C.F.R. part 1271 have the purpose of providing a comprehensive regulatory program for the regulation of human cellular and tissue-based product (now called human cells, tissues, and cellular and tissue-based products or HCT/Ps), which prior to 1997 was highly fragmented. Section 21 C.F.R. 1271.3(d) sets forth that all reproductive tissues are within the regulatory scope of the Regulations.

91.     Section 21 C.F.R. 1271.3(r) sets forth the definition of relevant communicable disease agent or disease under such regulations and includes:

(1)(i) for all human cells and tissues, a communicable disease or disease agent listed as follows:

48

(A) Human immunodeficiency virus, types 1 and 2;

(B) Hepatitis B virus;

(C) Hepatitis C virus;

(D) Human transmissible spongiform encephalopathy, including Creutzfeldt-Jakob disease; and

(E) *Treponema pallidum.*

(ii) For viable, leukocyte-rich cells and tissues, a cell-associated disease agent or disease listed as follows:

(A) Human T-lymphotropic virus, type I; and

(B) Human T-lymphotropic virus, type II.

(iii) For reproductive cells or tissues, a disease agent or disease of the genitourinary tract listed as follows:

(A) *Chlamydia trachomatis;* and

(B) *Neisseria gonorrhea.*

(2) A disease agent or disease not listed in paragraph (r)(1) of this section:

(i) For which there may be a risk of transmission by an HCT/P, either to the recipient of the HCT/P or to those people who may handle or otherwise come in contact with it, such as medical personnel, because the disease agent or disease:

(A) Is potentially transmissible by an HCT/P and

(B) Either of the following applies:

(1) The disease agent or disease has sufficient incidence and/or prevalence to affect the potential donor population, or

(2) The disease agent or disease may have been released accidentally or intentionally in a manner that could place potential donors at risk of infection;

(ii) That could be fatal or life-threatening, could result in permanent impairment of a body function or permanent damage to body structure, or could necessitate medical or surgical intervention to preclude permanent impairment of body function or permanent damage to a body structure;

and

(iii) For which appropriate screening measures have been developed and/or an appropriate screening test for donor specimens has been licensed, approved, or cleared for such use by FDA and is available.

92.     The purpose of 21 C.F.R. Part 1271.1 is to create an electronic registration and listing system for establishments that manufacture HCT/P's and to establish donor-eligibility, current good tissue practice, and other procedures to prevent the introduction, transmission, and spread of communicable diseases by HCT/P's.

93.     The FDA regulates under 21 C.F.R. 1271 all establishments in the Assisted Reproductive Technology ("ART") industries which are involved in the sale of sperm and/or oocytes in order to use such HCT/P's for the purpose of creating a new human life.

94.     The term "Relevant medical records" is defined under 21 C.F.R. part 1271.3(s) as:

(s) a collection of documents that includes a current donor medical history interview; a current report of the physical assessment of a cadaveric donor or the physical examination of a living donor; and, if available, the following:

(1) Laboratory test results (other than results of testing for relevant communicable disease agents required under this subpart);

50

(2) Medical records;

(3) Coroner and autopsy reports; and

(4) Records of other information received from any source pertaining to risk factors for relevant communicable disease (e.g., social behavior, clinical signs and symptoms of relevant communicable disease, and treatments related to medical conditions suggestive of risk for relevant communicable disease).

95. According to the Centers for Disease Control website for the National Center for Health Statistics, the data and statistics published about the National Survey of Family Growth are used, *inter alia*, by "Agencies of the U.S. Department of Health and Human Services (HHS) to brief senior officials and to inform program decision-making and policy discussions" and such information is thus expected to be used by the FDA when it determines how to comply with its obligations pursuant to a delegation of authority from the HHS, including to draft, issue, amend and ensure compliance with regulations regarding HCT/Ps in Title 21 C.F.R. Part 1271.[25]

96. Genetic material is contained within all donated gametes sold by establishments in the ART Industries which are regulated by the FDA under 21 C.F.R. 1271.

97. Genetic material within human sperm and/or oocyte HCT/P's are necessarily passed along to each and every human being who is born with gametes sold and purchased through establishments regulated by the FDA under 21 C.F.R. 1271.

98. The regulation by the FDA of HCT/P's in 21 C.F.R. 1271, and its subparts, is the sole source of federal regulation of Establishments licensed in the legal sale of human sperm and oocytes in the United States.

---

[25] See, About the National Survey of Family Growth, available at https://www.cdc.gov/nchs/nsfg/about_nsfg.htm

99.     The Isel Citizen Petition, the responses and appeals thereto, and the present lawsuit, focus in large part on the problems caused for the donor-conceived population by Title 21 C.F.R. § 1271.55(d)(4), which governs the records which must accompany an HCT/P after the donor-eligibility determination is made, and how those records must be retained.  This section states as follows:

> You must retain the records pertaining to a particular HCT/P at least 10 years after the date of its administration, or if the date of administration is not known, then at least 10 years after the date of the HCT/P's distribution, disposition, or expiration, whichever is latest.

21 C.F.R. 1271.55(d)(4), 69 FR 29830, May 25, 2004, as amended at 70 FR 29952, May 25, 2005.

100.     Originally, the ISEL Citizen Petition focused upon another section of Part 1271, which was 21 C.F.R. 1271.270(d), but during the course of the Response from the FDA, it advised that the appropriate section for *reproductive* HCT/Ps such as donor sperm and oocytes (eggs) was 21 C.F.R. 55(d)(4). The arguments of the Petitioner ISEL were the same under either 21 C.F.R. 1271.270(d) or 21 C.F.R. 55(d)(4). As the FDA made its decision on the underlying Citizen Petition using 21 C.F.R. 55(d)(4), and that is the section applying to reproductive HCT/Ps which requires modification, this present Complaint is brought incorporating requested changes for 21 C.F.R. 55(d)(4) instead of 1271.270(d), and in order to conform to the ruling made by the FDA in the underlying responses to the ISEL Citizen Petition. ISEL's position remained, and remains, the same regardless of regulatory section, as both sections have identical operative language providing for destruction at a point 10 years after last administration, distribution, disposition, or expiration, whichever is latest.

101.     On November 18, 2004, the FDA issued regulations that require establishments that manufacture HCT/Ps to comply with Current Good Tissue Practices (CGTP), which include, inter alia, proper handling, processing, labeling, and record-keeping procedures.

102.     On August 24, 2007 the FDA issued a Guidance for Industry entitled "Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) – Small Entity Compliance Guide: Guidance for Industry" (hereinafter, "2007 Guidance for Small Entity HCT/Ps"),[26] which was intended to be comprehensively regulated on issues of donor eligibility, current good tissue practice, and other procedures required to prevent the introduction, transmission and spread of communicable diseases by HCT/Ps.   These were in place at the time of the filing of the ISEL Citizen Petition and is addressed therein.

103.     On October 30, 2015, the FDA published four draft Guidances issued by the FDA relating to the regulation of human cells, tissues, or cellular or tissue-based products (HCT/Ps). [27] These draft Guidances were issued by FDA in response to stakeholders' requests for guidance on FDA's current views about how manufacturers, establishments, and distributors of HCT/Ps and health care professionals can be met the criteria under the Agency's regulations that apply to HCT/Ps.

104.     The FDA conducted hearings from September 12-13, 2016 involving seven FDA Directors and Associate Directors, Senior Counsel for the FDA, dozens of members of drug

---

[26] Available at https://wayback.archive-it.org/7993/20201218135320/https://www.fda.gov/regulatory-information/search-fda-guidance-documents/regulation-human-cells-tissues-and-cellular-and-tissue-based-products-hctps-small-entity-compliance

[27] Published Draft Guidances available at https://www.federalregister.gov/documents/2015/10/30/2015-27703/draft-guidances-relating-to-the-regulation-of-human-cells-tissues-or-cellular-or-tissue-based

companies, and zero members of the donor-conceived community, relating to proposed updating of the 2007 Draft Guidances Related to the Regulation of HCT/Ps.[28][29].

105.    Neither the four Proposed Draft Guidances from 2015 nor the hearings from September 12-13, 2016 related to the interests of the Donor-Conceived community or their access to records maintained by HCT/P establishments, as they are impacted by the FDA Regulations in 21 C.F.R. Part 1271.

106.    The Part 15 Hearing on the Draft Guidances was completed two days before the Isel Citizen Petition was sent to the FDA, although ISEL had no knowledge of the hearing or its results until after the denial of his appeals due to crossing of the ISEL petition in the mail at the time the hearing was being transcribed and published for the public.

107.    While portions of the subject matter discussed were directly on point with the Isel Citizen Petition, the FDA made no mention of the Draft Guidances or Hearing when responding to the Isel Citizen Petition, nor indicate if the Citizen Petition input would be considered along with the Hearing information.  Instead, nearly two years later, in August 2018, the FDA denied the Petition, as set forth in this Complaint, making no mention of the September 2016 Hearing or the Draft Guidances, or their relation to the topics raised in the Isel Citizen Petition.

108.    Upon information and belief, the CBER did not consider any of the topics raised in the Isel Citizen Petition for inclusion or to for update of the 2007 Draft Guidances Related to the

---

[28] Transcript of September 12, 2016 hearing available at
https://fda.report/media/101978/September-12--2016---Public-Hearing--Request-for-Comments-_-Draft-Guidances-Relating-to-the-Regulation-of-Human-Cells--Tissues-or-Cellular-or-Tissue-Based-Products.pdf+%2Autf-8%27%27September-12--2016---Public-Hearing--Request-for-Comments-%25E2%2580%2593-Draft-Guidan
[29] Transcript of September 13, 2016 Hearing available at
https://www.fda.gov/media/101901/download

Regulation of HCT/Ps at any time subsequent to the September 2016 Part 15 hearings, including but not limited to:

a. the interests of the Donor-Conceived Persons generally;

b. the interests raised by ISEL in his Citizen Petition specifically;

c. the interests raised by any of those persons who filed Public Comments to the ISEL Citizen Petition, specifically;

d. the practical difficulties faced by Donor-Conceived Persons in general to obtain records of their reproductive bio-donors from regulated Establishments under the then-present regulatory scheme of § 1271.55(d)(4);

e. the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons reached the age of legal majority;

f. the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons learn of their status as Donor-Conceived Persons, when this occurred after the person reached the age of legal majority;

g. whether genetic testing or genetic screening should be required of reproductive bio-donors to determine their eligibility under Part 1271, subpart C, including the risk that such conditions could be passed from reproductive bio-donors to Donor-Conceived Persons;

h. whether the results of any genetic testing or screening must be disclosed to purchasers of donated gametes, to ensure mandatory maximum disclosure of risks

of transmission of heritable conditions prior to undergoing IVF or similar ART procedures using such purchased donor sperm or oocytes;

i. whether the results of any genetic testing or screening must be disclosed to Donor-Conceived Persons upon their request, after reaching the age of majority and upon a reasonable time after learning of their Donor-Conceived origins, in accordance with their right to obtain timely and accurate medical diagnosis and treatment of any inherited conditions or risks;

j. the impact of the availability of consumer-directed products for genetic testing and evaluation of genetic heritability risks of sperm and oocyte reproductive donors, and the prevalence of use of these products in services offered by FDA-regulated Establishments, upon the Relevant Medical Record preservation requirements of reproductive donors under § 1271.55(d)(4).

109. On or about November 1, 2022, the FDA issued a Guidance for Industry entitled "Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) – Small Entity Compliance Guide: Guidance for Industry" (hereinafter, "2022 Guidance for Small Entity HCT/Ps") [30], which superseded the 2007 Guidance for Small Entity HCT/Ps. The document provides in a double-boxed area, in italicized print, prior to the introduction section of text, as follows: "This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page."

---

[30] Available at  https://www.fda.gov/media/70689/download

110. In order to meet its stated mission to protect and enhance public health through the regulation of biological and related products including, *inter alia*, tissues and cellular and gene therapies, the Center for Biologics Evaluation and Research (CBER) established the Office of Therapeutic Products (OTP), with implementation as of February 26, 2023.[31] The OTP's so-called "super office structure" within the CBER provides for 6 offices overseeing 14 Divisions and 33 branches, all of which are considered by the FDA to be under the scope of the CBER and FDA's mandate. These include the Office of Gene Therapy Chemistry, Manufacturing and Controls (CMC); Office of Cellular Therapy and Human Tissue CMC; Office of Plasma Protein Therapeutics CMC; Office of Clinical Evaluation; Office of Pharmacology/Toxicology; and Office of Review management and Regulatory Review. Within the Office of Cellular Therapy and Human Tissue CMC is a Division of Human Tissues; Within the Division of Human Tissues is the Human Tissue/Reproduction Branch.

111. In January 2022, the FDA published The Guidance Agenda: Guidance Documents CBER is Planning to Publish During Calendar Year 2022[32], which indicated that, amongst other things, the CBER is considering the topic of "Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) – Small Entity Compliance Guide; Guidance for Industry." for development during the upcoming Calendar Year 2022. As noted in the document, "The list includes topics that currently have no guidance associated with them, topics where updated guidance may be helpful, and topics for which CBER has already issued Level 1 draft guidances that may be finalized following review of public comments."

---

[31] https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/establishment-office-therapeutic-products

[32] Available at https://www.fda.gov/media/120341/download

112. Upon information and belief, the CBER did not consider any of the topics raised in the Isel Citizen Petition for inclusion or update of the topics to be addressed during the Calendar Year 2022, including but not limited to:

a. the interests of the Donor-Conceived Persons generally;

b. the interests raised by ISEL in his Citizen Petition specifically;

c. the interests raised by any of those persons who filed Public Comments to the ISEL Citizen Petition, specifically;

d. the practical difficulties faced by Donor-Conceived Persons in general to obtain records of their reproductive bio-donors from regulated Establishments under the then-present regulatory scheme of § 1271.55(d)(4);

e. the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons reached the age of legal majority;

f. the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons learn of their status as Donor-Conceived Persons, when this occurred after the person reached the age of legal majority;

g. whether genetic testing or genetic screening should be required of reproductive bio-donors to determine their eligibility under Part 1271, subpart C, including the risk that such conditions could be passed from reproductive bio-donors to Donor-Conceived Persons;

h. whether the results of any genetic testing or screening must be disclosed to purchasers of donated gametes, to ensure mandatory maximum disclosure of risks

58

of transmission of heritable conditions prior to undergoing IVF or similar ART procedures using such purchased donor sperm or oocytes;

i. whether the results of any genetic testing or screening must be disclosed to Donor-Conceived Persons upon their request, after reaching the age of majority and upon a reasonable time after learning of their Donor-Conceived origins, in accordance with their right to obtain timely and accurate medical diagnosis and treatment of any inherited conditions or risks;

j. the impact of the availability of consumer-directed products for genetic testing and evaluation of genetic heritability risks of sperm and oocyte reproductive donors, and the prevalence of use of these products in services offered by FDA-regulated Establishments, upon the Relevant Medical Record preservation requirements of reproductive donors under § 1271.55(d)(4).

113. On January 6, 2025, FDA announced the availability of a draft guidance document "Recommendations for Determining Eligibility of Donors of HCT/Ps" (hereinafter "2025 Draft Guidance for HCT/Ps Industry").[33] The FDA website and the 2025 Draft Guidance for HCT/Ps Industry document itself indicate that "this guidance document is for comment purposes only" and mark each page of the document with the words "**Contains Nonbinding Recommendations**" and "*Draft - Not for Implementation*" (emphasis and font choices same as in original).

114. On January 15, 2025, a recorded webinar providing a high-level overview of the draft guidance document was published by Dr. Simone Porter, Human Tissue/Reproduction Branch, Division of Human Tissues, Office of Cellular Therapy and Human Tissues, Office of

---

[33] Available at https://www.fda.gov/media/184904/download

Therapeutic Products, CBER.[34] The FDA published an additional video webinar on the same date by Irma Sison, MD, MBA, the Director of the Division of Human Tissues, on the Draft Guidance for Industry in respect to Recommendations to Reduce the Risk of Transmission of HIV, HBV, and HCV by Human Cells, Tissues, and /Cellular and Tissue-Based Products (HCT/Ps).[35]

115. The stated purpose of the 2025 Draft Guidance for HCT/Ps Industry is to supersede the earlier guidance documents and indicate their current recommendations and guidance as they relate to establishments responsible for performing any part of donor eligibility screening or testing, or for making donor eligibility determination, as well as those establishments that determine that an HCT/P meets donor eligibility release criteria and make the HCT/P available for distribution.

> We, FDA, are issuing this guidance to assist you, establishments making donor eligibility determinations, in understanding the requirements in Title 21 Code of Federal Regulations, part 1271, subpart C (21 C.F.R. part 1271,subpart C). The regulations under 21 C.F.R. part 1271, subpart C set out requirements for determining donor eligibility, including donor screening and testing, for donors of human cells, tissues, or cellular or tissue-based products (HCT/Ps).

---

[34] At https://fda.zoomgov.com/rec/play/Zd7ideS_V3f4lAcjLUpLrLHlt_L7wsjOyE33S0t2kBbua77w7QdK0rC02E GoEX6tfmHSRhNoHR2rwkhE.rAWFsWLR-J9cYUkj?eagerLoadZvaPages=&accessLevel=meeting&canPlayFromShare=true&from=share_recording_d etail&startTime=1736972634000&oldStyle=true&componentName=rec-play&originRequestUrl=https%3A%2F%2Ffda.zoomgov.com%2Frec%2Fshare%2FF2UY1pKwpLE_z6Ryx4 G6pdFM-SqSTSdtf2JY9TYQas_Q5VHcrDDyxaHFqaCKtYDM.avRzvzJIYFiTNNGt%3FstartTime%3D1736972634000

[35] Available at https://fda.zoomgov.com/rec/play/XWrMj3tSIoMKB-bLpAsZiyIwHgqX75bhgsTWbwXh6txa_cbHjH4Gv8DqVUwzWYu_qm8BlsG7byGM6mpQ.FiIbiUXUSF2W9C VG?canPlayFromShare=true&from=share_recording_detail&continueMode=true&componentName=rec -play&originRequestUrl=https%3A%2F%2Ffda.zoomgov.com%2Frec%2Fshare%2FxQqQM-W7WEh3pWw_xEnHepnAAGm8AcdLgpxAa0FRavjd8jfrPd8FfeOYaDeVMqgN.nNG7EMickpY41wZX

60

This guidance includes general information on determining eligibility for donors of HCT/Ps.

2025 Draft Guidance for HCT/Ps Industry, Section I, lines 17 – 23.

116.     Upon information and belief, the CBER did not consider any of the topics raised in the Isel Citizen Petition for inclusion or update within the 2025 Draft Guidance for HCT/Ps Industry, including but not limited to:

a.   the interests of the Donor-Conceived Persons generally;

b.   the interests raised by ISEL in his Citizen Petition specifically;

c.   the interests raised by any of those persons who filed Public Comments to the ISEL Citizen Petition, specifically;

d.   the practical difficulties faced by Donor-Conceived Persons in general to obtain records of their reproductive bio-donors from regulated Establishments under the then-present regulatory scheme of § 1271.55(d)(4);

e.   the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons reached the age of legal majority;

f.   the potential for, and past history of, regulated Establishments' destruction of the reproductive bio-donors' Relevant Medical Records prior to the time descendant Donor-Conceived Persons learn of their status as Donor-Conceived Persons, when this occurred after the person reached the age of legal majority;

g.   whether genetic testing or genetic screening should be required of reproductive bio-donors to determine their eligibility under Part 1271, subpart C, including the risk

that such conditions could be passed from reproductive bio-donors to Donor-Conceived Persons;

h. whether the results of any genetic testing or screening must be disclosed to purchasers of donated gametes, to ensure mandatory maximum disclosure of risks of transmission of heritable conditions prior to undergoing IVF or similar ART procedures using such purchased donor sperm or oocytes;

i. whether the results of any genetic testing or screening must be disclosed to Donor-Conceived Persons upon their request, after reaching the age of majority and upon a reasonable time after learning of their Donor-Conceived origins, in accordance with their right to obtain timely and accurate medical diagnosis and treatment of any inherited conditions or risks;

j. the impact of the availability of consumer-directed products for genetic testing and evaluation of genetic heritability risks of sperm and oocyte reproductive donors, and the prevalence of use of these products in services offered by FDA-regulated Establishments, upon the Relevant Medical Record preservation requirements of reproductive donors under § 1271.55(d)(4).

### VII. FACTS COMMON TO ALL CLAIMS

117. None of the provisions from existing regulations or any of the Guidances or videos provided by the FDA to guide the regulated Establishments have made any updates to the Record retention requirements of 21 C.F.R. 1271.55(d)(4) since the filing of the ISEL Citizen Petition.

118. None of the above provisions from existing regulations or any of the Guidances or videos provided by the FDA to guide the regulated Establishments have made any changes that took into account the interests of, desires of, needs of, or rights of Donor-Conceived Persons since

62

the filing of the ISEL Citizen Petition, including the Plaintiff NICHOLAS ISEL in this case, any of the Donor-Conceived Persons who provided Public Comments to the ISEL Citizen Petition, or any similarly situated Donor-Conceived Persons throughout the United States.

119. None of the above provisions from existing regulations or any of the Guidances or videos provided by the FDA to guide the regulated Establishments have made any changes since the filing of the ISEL Citizen Petition that took into account the interests of, desires of, needs of, or rights of similarly situated Donor-Conceived Persons living in the United States whose biological donors' Relevant Medical Records may soon be destroyed due to approaching of 10 years past the last date of administration or other triggering date under 21 C.F.R. 1271.55(d)(4), even if they are still legal minors, have rights to obtain those records under other federal or state laws, or are not yet aware they are Donor-Conceived.

120. To the extent the HCT/Ps require additional science, medicine, and public health issues, the FDA is required to consult with experts in the field, and further act in cooperation with consumers and users of regulated products. 21 U.S.C. § 393(b)(4).The FDA is required to identify and protect the public from harm caused by HCT/Ps which include communicable diseases or diseases which have a high risk of transmission through donor sperm or oocytes, and to ensure appropriate disclosure is made of those risks to those persons receiving the reproductive donor gametes for implantation.

121. Semen, oocytes and embryos are all covered forms of HCT/Ps, and are regulated by 21 C.F.R. Part 1271, the 2007 Guidance for Industry, and by section 361 of the Public Health Service Act (PHS Act), 42 U.S.C. 264.

122. When taken together, the FDA's stated mission, Section 361 of the PHS Act, 21 C.F.R. Part 1271, and the 2007 Guidance for Industry, along with the policies and updates set forth

63

in the nonbinding 2025 Draft Guidance for HCT/Ps Industry and the 2025 FDA webinars, mandate that the FDA enact regulations and enforce such regulations in the field of HCT/Ps which must be sufficient to prevent the introduction, transmission, and spread of known or knowable risks of debilitating, genetically transmitted diseases when the industry being regulated is one which creates a new human being, such as occurs with establishments which sell sperm and oocyte products, and other Assistive Reproductive Technology (ART) products. They must, at a minimum, maintain the records and allow recipients of bio-donor gametes which have documentation relating to those risks to obtain such records so that they may receive the necessary and essential medical treatment they require for their own health purposes.

123. The donor semen which led to the conception and birth of Plaintiff ISEL, as well as those Donor-Conceived Persons making Public Comments on the Citizen Petition in Exhibit H, and similarly situated Donor-Conceived Persons throughout the United States, were classified as HCT/Ps regulated solely by the FDA under section 361 of the PHS Act and, during the applicable time periods after 1997, the FDA's 1997 HCT/Ps Documents, 21 C.F.R. Part 1271, published on January 18, 2001 and effective on January 21, 2004, and the 2007 Guidance for Industry, and the 2025 Draft Guidance for Industry, the latter of which has not yet come into force.

124. Under the current regulatory scheme, HCT/Ps establishments are regulated by and required to register with the FDA, and required to screen and test for the existence of, known risk factors for, or any clinical evidence of communicable disease agents and diseases, as well as any communicable disease risks associated with ART (Assisted Reproduction Technologies).

125. Under the current regulatory scheme of 21 C.F.R. 1270.1 et seq, and the Current Good Tissue Practices related thereunder, and the 2007 Guidance for Industry, and within the 2025 Draft Guidance for Industry, the FDA does not require that HCT/P establishments screen and test

for, or disclose to potential parents purchasing sperm or oocytes from establishments registered with the FDA, any information which that facility possesses regarding the existence of, known risk factors for, or any clinical evidence of inheritable physical or mental health conditions, and/or diseases which have a higher than average risk of transmission based on heredity from biological parent to biological child.

126. Even if an existing reproductive technology Establishment regulated by the FDA were to voluntarily screen and test for the existence of inheritable physical or mental health conditions in sperm or oocyte donors, or known risk factors or clinical evidence of same, such FDA-regulated Establishments are not be required, under today's regulatory laws, and including the 2007 Guidance for Industry currently in place or the 2025 Draft Guidance not yet in force, to maintain any records relating to a semen donor's condition or an oocyte donor's condition for more than 10 years past the date of the last HCT/Ps administration. This means any and all records of potentially life-changing health information for a donor-conceived person are authorized by the FDA for destruction when the donor-conceived child is as young as nine (9) years old and has no legal right to request such records about their own health. In many such circumstances, even if they had actual knowledge of the circumstances of their birth at that age, or in the unlikely event they had the mental capacity to understand what being donor-conceived meant at such a young age. Although it relates to inheritable conditions between a biological parent and biological child, the FDA has undertaken the regulation and monitoring of transmission of COVID-19 and the human immunodeficiency virus (HIV), while arbitrarily excluding other conditions which may similarly be transmitted through genetic transmission, thereby depriving donor-conceived persons of essential information relating to their conception and inheritable health conditions.

127. The regulations in 21 C.F.R. 1271 which are at issue in this Complaint have not been updated by the FDA since the Guidance for Industry was published in 2007, despite extensive changes in technology regarding donor insemination, extensive changes in how the law interprets the rights of U.S. citizens including those born of donated gametes, and the birth of millions of donor-conceived individuals. The 2025 Guidance remains in draft form, with no plans to update for the consideration of genetic or inheritable conditions, no consideration of the rights of Donor-Conceived persons to obtain records at any time, or to preserve those records until such time as Donor-Conceived persons born pursuant to the FDA's own statutory scheme can be expected to learn about their status and existence of these vital health and medical records.

128. As recently confirmed by the United States Supreme Court in *Trump v. Barbara*, 09 U.S. _____ (2026), pursuant to the 14th Amendment to the U.S. Constitution, without exception, "All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." All donor-conceived human beings born in the United States with the use of sperm and/or oocyte HCT/P's, which are purchased from establishments in the ART Industries that are regulated by the FDA under 21 C.F.R. 1271, are United States citizens.

129. Donor-conceived individuals born in the United States with the use of sperm and/or oocyte HCT/P's, which are purchased from establishments in the ART Industries that are regulated by the FDA under 21 C.F.R. 1271, possess the same rights guaranteed to non-donor-conceived United States Citizens under the U.S. Constitution, the laws of the United States, and the laws of the State in which they reside.

130. It is the responsibility of the FDA, pursuant to the power delegated from HHS, through promulgation of regulations relating to entities which sell reproductive tissues such as

human sperm and/or oocytes, to prevent and/or minimize the spread and impact of a gamete donor's diseases, disorders, and/or disabilities that have a reasonable likelihood of being inherited by the biological offspring of such gamete donors.

131. It is the responsibility of the FDA, pursuant to power delegated from HHS, to regulate the creation and preservation of records kept by establishments which sell reproductive tissues such as human sperm and/or oocyte HCT/P's, so that information which relates to the existence of a gamete donor's diseases, disorders, and/or disabilities that have a reasonable likelihood of being inherited by the biological offspring of such gamete donors, are disclosed to the prospective purchasers of such gametes.

132. It is the responsibility of the FDA, pursuant to power delegated from HHS, to regulate the creation and preservation of records kept by entities which sell reproductive tissues such as human sperm and/or oocyte HCT/P's, so that information which relates to the existence of a gamete donor's diseases, disorders, and/or disabilities that have a reasonable likelihood of being inherited by the biological offspring of such gamete donors, are disclosed to the living human offspring of such gamete donors.

133. Despite the duties of the FDA, pursuant to power delegated from HHS, as set forth herein, the FDA has refused to protect the interests of the class of United States citizens who are living human offspring of gamete donors, instead creating regulations in Title 21 Code of Regulations Part 1271.55(d)(4) which authorize the destruction of all records relating to sperm and/or oocyte donors of HCT/P's, including the destruction of all records of such donors' medical history, history of diseases, disorders, and/or disabilities, within ten years of the last date of donation.

134. Title 21 Code of Regulations Part 1271.55(d)(4), as written and interpreted in the FDA's publication Guidance for Industry, Regulation of Human Cells, Tissues and Cellular and tissue-Based Products (HCT/Ps), Small Entity Compliance Guide, allows establishments which sold sperm and/or oocyte tissues to destroy all records relating to gamete donors at the time when the living human offspring of such gamete donors are legal minors of approximately 9 years old.

135. Despite formal requests in a Citizen Petition, and applicable administrative appeals, by the Plaintiff NICHOLAS ISEL, as set forth below, the FDA has refused and continues to refuse to take such steps as necessary to amend Title 21 Code of Regulations Part 1271.55(d)(4) in regards to establishments involved in sperm and/or egg donation ART (Assisted Reproductive Technology) industries to require collection, upkeep, communication with donors/recipients of updates, and retention of all relevant personal and medical information from donors and recipients for a period of no less than 50 years, instead of the currently required 10 year time span, so that relevant persons, including donor-conceived persons such as the Plaintiff NICHOLAS ISEL herein, and all similarly situated Donor-Conceived Persons, may obtain such information for the purposes of individual/public health and well-being, including tracking of genetic diseases and recessive gene carrier information, and for such other equitable relief as the Court may deem appropriate.

136. As a Donor-Conceived Person who is an Illinois and United States citizen Plaintiff NICHOLAS ISEL's own Designated Records Set rightfully includes any records which were collected by the Repository for Germinal Choice about his bio-donor Donor Coral #36, including that donor's Relevant Medical Record, as defined in 21 C.F.R.1271.3(s). It is only through their closure of their facility prior to his reaching the age of majority, prior to his learning of his status as a Donor-Conceived Person, and due to the inadequacy of the FDA Regulations protecting the

68

donor's Designated Records Set from premature destruction that ISEL lacks access to the Relevant Medical Records of Donor Coral #36.

137.     Plaintiff NICHOLAS ISEL had a right to expect that records containing health information directly affecting his health would be preserved until he was at least 22 years old. Under Illinois law, every patient has a right to examine and copy their medical records from any healthcare facility or practitioner. 735 ILCS 5/8-2001. The interplay between 735 ILCS 5/8-2001, the Illinois Hospital Licensing Act, 210 ILCS 85/6.17, limitations on what can happen to records if facilities close under Illinois Administrative Code Title 77, Section 250.1510, and medical malpractice statutes of limitations for minors, combine to extend the time for retention of medical records containing health information directing a Donor-Conceived Person, such as NICHOLAS ISEL, to at least the age of 22, and thus NICHOLAS ISEL had a right to obtain records containing Donor Coral #36's Relevant Medical Record, as defined in § 1271.3(s), until at a minimum his 22nd birthday.

138.     Plaintiff NICHOLAS ISEL, as a person whose own Designated Records Set rightfully includes records collected by the California corporation Repository for Germinal Choice about his bio-donor Donor Coral #36, including that donor's Relevant Medical Record, as defined in 21 C.F.R. 1271.3(s), was entitled to additional rights under California law, since such was the State in which the Repository for Germinal Choice was located until it closed in 1999, and when, upon information and belief, prior to the time ISEL was told the records did not exist as of 2001, RGC destroyed all such records relating to Donor Coral #36 without regard to the existence or rights of NICHOLAS ISEL.  At both of these points in time in 1999 and 2001, Plaintiff was a legal minor. Cal. Code Regs. Tit. 22 § 70751(c) (2008) required preservation of minor medical records up through the time the minor reaches the age of 19. All Donor-Conceived Persons similarly

69

situated to NICHOLAS ISEL have similar rights to obtain their own Designated Records Set from the states in which the FDA-regulated facilities sit, and in accordance with that State's laws protecting access to minors' medical records, as well as to the states in which they are themselves legal residents. All 50 states have laws protecting the rights of legal minors to obtain their Designated Records Set at least through the age of majority, and usually for some period after that date, which in this case would include the records of the donor within the FDA-regulated Establishment whose Relevant Medical Record includes vital health information which was used specifically for the purpose of commencing the Donor-Conceived Person's life, including contributing 50% of their genetic materials.

139. The rights of the ISEL Plaintiff, like all United States citizens, include the right to access one's health records and the records relating to their conception and familial history, so that they are better able to manage their own care, monitor costs, and actively participate in their healthcare and maintain such health.

140. When the FDA denied the Isel Citizen Petition and refused to enact necessary implementing regulations, make necessary amendments to implementing regulations, and/or issue necessary guidance or take other action within the scope of their positions relating to the Title 21 Code of Regulations part 1271.55(d)(4) in regards to establishments involved in sperm and/or egg donation ART industries to require collection, upkeep, communication with donors/recipients of updates, and retention of all relevant personal and medical information from donors and recipients for a period of no less than 50 years instead of the currently required 10 year time span, so that Plaintiff NICHOLAS ISEL could obtain information for the purposes of their health and well being, including tracking of genetic diseases and recessive gene carrier information, and instead insisted on enforcing out of date and unlawful regulations without regard for Plaintiff's rights

70

under current laws, particularly ISEL's Patient Right of Access, as required by HIPAA, 45 C.F.R. § 164.524 and HITECH, and his rights to access his own and familial records affecting his health under 210 Ill. Comp. Stat 85/6.17(c) and Cal. Code Regs. Tit. 22 § 70751(c) (2008), the Food and Drug Administration thereby made an arbitrary and capricious decision exceeding its statutory authority which stripped the Plaintiff NICHOLAS ISEL of his inalienable rights to Equal Protection under the law, which all United States citizens have under the U.S. and Illinois Constitutions, and designated him, as well as his biological descendants, and all similarly situated Donor-Conceived persons and their biological descendants, to be second-class citizens who are entitled to fewer rights than U.S. Citizens who are not born through Donor-Conceived gametes.

141. The Plaintiff NICHOLAS ISEL and similarly situated Donor-Conceived Persons throughout the United States, including but not limited to those who have bravely shared their personal stories in the Public Comment Section of the FDA's Regulations.gov website for the present Citizen Petition, as reflected in Exhibit H hereto, have sought and been unable to obtain medical information and documents from the Sperm Donor Banks provided by their biological Sperm Donors and/or related to their conception, or else been unable to obtain such records due to impossibility, as more specifically set forth above.

142. By being unable to obtain medical information and documents from the his biological Sperm Donors and/or related to their conception, Plaintiff NICHOLAS ISEL, and similarly situated Donor-Conceived Persons throughout the United States, including but not limited to those who have bravely shared their personal stories in the Public Comment Section of the FDA's Regulations.gov website for the present Citizen Petition, as reflected in Exhibit H hereto, have been unable to access essential information they require for their personal medical

71

and mental health treatment, as well as the medical and mental health treatment of their biological children.

143. Plaintiff, NICHOLAS ISEL, and similarly situated Donor-Conceived Persons throughout the United States, including but not limited to those who have bravely shared their personal stories in the Public Comment Section of the FDA's Regulations.gov website for the present Citizen Petition, as reflected in Exhibit H hereto, object to being unable to obtain their personal medical information and documents originating from their Biological Father Sperm Donors, and/or relating to their conception, as such information is essential for their personal medical and mental health treatment and well-being, as well as the medical and mental health treatment and well-being of their own biological descendants..

144. Plaintiff, NICHOLAS ISEL, and similarly situated Donor-Conceived Persons throughout the United States, including but not limited to those who have bravely shared their personal stories in the Public Comment Section of the FDA's Regulations.gov website for the present Citizen Petition, as reflected in Exhibit H hereto, and their biological descendants currently existing and which will exist in the future, are irreparably injured as a direct result of the FDA's regulations which place insufficient information and documentary preservation requirements on FDA regulated Establishments which operate as donor banks for reproductive gametes, including sperm and egg donor banks.

145. Plaintiff, NICHOLAS ISEL, and similarly situated Donor-Conceived Persons throughout the United States, including but not limited to those who have bravely shared their personal stories in the Public Comment Section of the FDA's Regulations.gov website for the present Citizen Petition, as reflected in Exhibit H hereto, is aggrieved on a continuing and ongoing basis by the FDA's refusal to grant the Citizen Petition and refusal to extend the maintenance

period for records to a reasonable time period sufficient for access by Donor-Conceived Persons reach the age of majority and have a reasonable opportunity to learn of their status as a Donor-Conceived Person before destruction of their donor's records.

146. The relief sought in this Complaint will redress the injury suffered by the Plaintiff, which is caused by the FDA's denial of the Citizen Petition and the relief requested thereunder.

147. The Relevant Medical Record, preservation requirements and destruction under 21 C.F.R. 1271.55(d)(4) is exclusively regulated by the Defendant FDA.

148. When a sperm or oocyte donor provides their gametes to an FDA-regulated Establishment for the purposes of such sperm or ooctyes being used for reproductive purposes, that biological donor knows or should know that they are participating in the creation of a human life, to wit, a Donor-Conceived Person.

149. When a sperm or oocyte donor provides their gametes to an FDA-regulated Establishment for the purposes of such sperm or ooctyes being used for reproductive purposes, that biological donor knows or should know that it is reasonably foreseeable that the life of the Donor-Conceived Person will begin within the geographical reach of the FDA-regulated Establishment, eg within the United States of America.

150. As recently confirmed by the United States Supreme Court in *Trump v. Barbara*, 09 U.S. _____ (2026), pursuant to the 14th Amendment to the U.S. Constitution, without exception, "All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." All donor-conceived human beings born in the United States with the use of sperm and/or oocyte HCT/P's, which are purchased from establishments in the ART Industries that are regulated by the FDA under 21 C.F.R. 1271, are United States citizens.

73

151.    Donor-Conceived United States Citizens are entitled to the full protection of laws and all rights under those laws and the Constitution of the United States, and the State of their residence, equal to those rights provided to United States Citizens not born through donated gametes.

152.    The Relevant Medical Record of a biological donor whose gametes were used under 21 C.F.R. 1271 to create a Donor-Conceived United States Citizen, and whose Relevant Medical Record was created and maintained in order to determine his/her eligibility to provide 50% of the Donor-Conceived Person's genetic material in a reproductive process, is also a part of the Donor-Conceived Person's "Designated Record Set" under HIPAA, which provides them with access rights under 164 C.F.R. § 164.524

153.    Title 164 C.F.R. § 164.524 implements rules relating to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191, and provides as follows:

(a) Standard:  Access to protected health information.

    (1) Right of access.  Except as otherwise provided in paragraph (a)(2) or (a)(3) of this section, an individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set, for as long as the protected health information is maintained in the designated record set . . .

    (2) Unreviewable grounds for denial.  A covered entity may deny an individual access without providing the individual an opportunity for review, in the following circumstances.

\*\*\*

74

(i) An individual's access may be denied if the protected health information was obtained from someone other than a health care provider under a promise of confidentiality and the access requested would be reasonably likely to reveal the source of the information.

(b) Implementation specifications: Requests for access and timely action.

(1) Individual's request for access. The covered entity must permit an individual to request access to inspect or to obtain a copy of the protected health information about the individual that is maintained in a designated record set. The covered entity may require individuals to make requests for access in writing, provided that it informs individuals of such a requirement.

(2) Timely action by the covered entity.

(i) Except as provided in paragraph (b)(2)(ii) of this section, the covered entity must act on a request for access no later than 30 days after receipt of the request as follows.

*** 

(c) Implementation specifications: Provision of access. If the covered entity provides an individual with access, in whole or in part, to protected health information, the covered entity must comply with the following requirements.

(1) Providing the access requested. The covered entity must provide the access requested by individuals, including inspection or obtaining a copy, or both, of the protected health information about them in designated record sets. . . .

* * *

(3) Time and manner of access.

(i) The covered entity must provide the access as requested by the individual in a timely manner as required by paragraph (b)(2) of this section, including arranging with the individual for a convenient time and place to inspect or obtain a copy of the protected health information, or mailing the coy of the protected health information at the individual's request. The covered entity may discuss the scope, format, and other aspects of the request for access with the individual as necessary to facilitate the timely provision of access.

*** 

(d) Implementation specifications: Denial of access. If the covered entity denies access, in whole or in part, to protected information, the covered entity must comply with the following requirements.

(1) Making other information accessible. The covered entity must, to the extent possible, give the individual access to any other protected health information requested, after excluding the protected health information as to which the covered entity has a ground to deny access.

154. In 1996, Congress passed the Health Insurance Portability and Accountability Act ("HIPAA") to "encourag[e] the development of a health information system," and tasked the Department of Health and Human Services ("HHS") with providing Congress recommendations on standards with respect to Protected Health Information (PHI), including individuals' rights to their PHI, the procedures for exercising such rights, and the authorized uses and disclosure of PHI. See Pub. L. 104-191, title II, §§ 261, 264(a)–(b), 110 Stat. 1936, 2021, 2033 (1996). In 2000, HHS issued a final rule pursuant to its rulemaking authority, known as the "Privacy Rule." See Standards

for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,462 (Dec. 28, 2000) (codified at 45 C.F.R. § 164.500 et seq.). This Privacy Rule establishes an individual's right to access PHI, and obtain copies thereof. See generally 45 C.F.R. § 164.524.

155. In 2009 Congress passed the Health Information Technology for Economic and Clinical Health Act, or HITECH Act, in response to the growth of distinct digital-record formats and storage system. Pub. L. No. 111-5, Title XIII, 123 Stat. 115, 226 (2009). This simplified the process for delivery of certain PHI relating to electronic health records, or EHRs. See 42 U.S.C § 17935(e), maintaining the right of the individual to obtain copies of PHI contained in an HER without the need for a valid authorization under the original Privacy Rule which implemented HIPAA.

156. In 2013, HHS amended the Privacy Rule as part of broad set of new regulations, which the court refers to as the "2013 Omnibus Rule." See Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the [HITECH] Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules, 78 Fed. Reg. 5,566 (Jan. 25, 2013). The 2013 Omnibus Rule broadened the HITECH Act to reach requests for PHI contained in any format, and not just in an EHR. The Privacy Rule states: "If an individual's request for access directs the covered entity to transmit the copy of [PHI] directly to another person designated by the individual, the covered entity must provide the copy to the person designated by the individual." 45 C.F.R. § 164.524(c)(3)(ii). The copy must be provided to the individual "in the form and format requested by the individual, if it is readily producible in such form and format." Id. § 164.524(c)(2)(i). Additionally, if the requested PHI is maintained in any electronic format, the covered entity must provide the information in "the electronic form and format requested by the individual, if it is readily producible in such form and format." Id. § 164.524(c)(2)(ii). HHS

77

cited its general rulemaking power under section 264(c) of HIPAA which allowed it to prescribe the rights individual should have with respect to their PHI to strengthen the right of access provided under section 17935(E) of the HITECH Act more uniformly to all PHI maintained in one or more designated record sets electronically, regardless of whether the designated record set is an HER." Id. In 2016, HHS issued a guidance document titled "individuals' Right under HIPAA to Access their Health Information 45 C.F.R. § 164.524."

157. Plaintiff NICHOLAS ISEL is entitled to Judicial Review under 5 U.S. Code § 702 and 21 C.F.R. 10.45, as he has have suffered a legal wrong because of the agency action of the FDA, due to the Director of the Center for Biologics Evaluation and Research's denial of the Isel Citizen Petition, and the Principal Associate Commissioner For Policy's Response to the Request for Reconsideration denying relief, and the Commissioner of Food and Drug's denial of the Formal Dispute Resolution Request, and accompanying declaration of finality in that FDRR denial.

158. During a review of the denial of a Citizen Petition, 21 C.F.R. § 10.35(k) defines the scope of the administrative record.

> (1) The record of the original petition specified in § 10.30(i).
>
> (2) The petition for reconsideration, including all information on which it relies, filed by the Dockets Management Branch.
>
> (3) All comments received on the petition, including all information submitted as a part of the comments.
>
> (4) The Commissioner's decision on the petition under paragraph (f) of this section, including all information identified or filed by the Commissioner with the Dockets management Branch as part of the record supporting the decision.

(5) Any FEDERAL REGISTER notices or other documents resulting from the petition.

(6) All documents filed with the Dockets Management Branch under § 10.65(h).

(7) If the Commissioner reconsiders the matter, the administrative record relating to reconsideration specified in § 10.30(i).

## VIII.   CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY
### AND CONTRARY TO LAW

159.    Plaintiff incorporates the allegations in the preceding paragraphs as though fully set forth herein.

160.    Under the Administrative Procedure Act, a court "shall . . . hold unlawful and set aside agency action" which is found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C).

161.    Commissioner of Food and Drugs Stephen M. Hahn's denial of the Plaintiff's Request for Review under 21 C.F.R. § 10.75 on July 24, 2020, and thereby continued refusal to grant the Isel Citizen Petition, was a final agency act. See Exhibit F.

162.    Plaintiff ISEL and other Donor-Conceived Persons, including those who commented on the Isel Petition and other Donor-Conceived Persons similarly situated in the United States, suffer irreparable harm by the refusal of the FDA to change its regulation regarding destruction of donor records.

79

163.    Every day more Donor-Conceived Persons lose access to records of their biological donor. For many of these Donor-Conceived Persons who lose access, they are legal minors who lack the ability to act on their own behalf to obtain records prior to their destruction. Others are blithely unaware, through the concealment by third parties, that they were conceived by donated gametes.  Many will develop symptoms of conditions with a heritable component which proper medical treatment requires their physicians obtain bio-parental medical history.  When the FDA denies Donor-Conceived Persons access to the only known source of physical and mental health information that comprises 50% of the genetic material of these Donor-Conceived American Citizens, the FDA creates irreparable harm which is unlawful, not in accordance with law, outside their statutory jurisdiction, authority or limitations, and without observance of procedure required by law.

164.    The Defendants' denial of the Citizen Petition was "not in accordance with law" as demonstrated above because the FDA has created a regulatory scheme which allows its regulated Establishments to permanently destroy records and information that is solely available through the Relevant Medical Records created at or near the time the donor provides his donated sperm or her donated oocytes.  This vital information about the anonymous donor, about whom Donor-Conceived Persons often have limited or no information, is based upon the information in the Isel Citizen Petition and in the many comments thereto often destroyed prior to the time the Donor-Conceived Person reaches the age of majority or even knows that they are born from donated gametes. These Records comprise a portion of the Donor-Conceived Person's own Designated Records set which provides them with rights under federal and state laws to access those records, including but not limited to HIPAA and state medical records retention laws. The FDA is acting

not in accordance with law by establishing records allowing for destruction of records prior to the time required for maintenance of records under federal and state laws.

165. The FDA acted in excess of its statutory authority and in a manner contrary to law when it proclaimed in the original Response to the Citizen Petition, Exhibit B, that, although the term "communicable diseases" is not specifically defined in section 361 of the PHS Act, the FDA would interpret the term to be limited to illnesses that are due to infectious agents or their toxic products, and therefore would engage in its exclusive regulation of the entire field of reproductive gametes through 21 C.F.R. 1271 while simultaneously being unconcerned about the issuance of regulations for the purpose of preventing the introduction, transmission,  or spread of genetic diseases to those Donor-Conceived Persons it births through the operation of its regulations,

**COUNT TWO**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**ARBITRARY, CAPRICIOUS AND AN ABUSE OF AGENCY DISCRETION**

166. Plaintiff incorporates the allegations in the preceding paragraphs as though fully set forth herein.

167. Under the Administrative Procedure Act, a court "shall . . . hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

168. The Defendants' denial of the Citizen Petition was arbitrary and capricious and not in accordance with law as demonstrated above because the FDA has created a regulatory scheme which allows its regulated Establishments to permanently destroy records and information that is solely available through the Relevant Medical Records created at or near the time the donor provides his donated sperm or her donated oocytes.  This vital information about the anonymous

donor, about whom Donor-Conceived Persons often have limited or no information, is based upon the information in the Isel Citizen Petition and in the many comments thereto often destroyed prior to the time the Donor-Conceived Person reaches the age of majority or even knows that they are born from donated gametes. These Records comprise a portion of the Donor-Conceived Person's own Designated Records set which provides them with rights under federal and state laws to access those records, including but not limited to HIPAA and state medical records retention laws. The FDA is acting not in accordance with law by establishing records allowing for destruction of records prior to the time required for maintenance of records under federal and state laws.

169.    The FDA acted in an arbitrary and capricious manner, and in a manner abusing its discretion when it proclaimed in the original Response to the Citizen Petition, Exhibit B, that, although the term "communicable diseases" is not specifically defined in section 361 of the PHS Act, the FDA would interpret the term to be limited to illnesses that are due to infectious agents or their toxic products, and therefore would engage in its exclusive regulation of the entire field of reproductive gametes through 21 C.F.R. 1271 while simultaneously being unconcerned about the issuance of regulations for the purpose of preventing the introduction, transmission,  or spread of genetic diseases to those Donor-Conceived Persons it births through the operation of its regulations,

170.    Every day more Donor-Conceived Persons lose access to records of their biological donor. For many of these Donor-Conceived Persons who lose access, they are legal minors who lack the ability to act on their own behalf to obtain records prior to their destruction. Others are blithely unaware, through the concealment by third parties, that they were conceived by donated gametes.  Many will develop symptoms of conditions with a heritable component which proper medical treatment requires their physicians obtain bio-parental medical history.  When the FDA

82

denies Donor-Conceived Persons access to the only known source of physical and mental health information that comprises 50% of the genetic material of these Donor-Conceived American Citizens, the FDA creates irreparable harm in an arbitrary and capricious manner which is an abuse of discretion and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

**COUNT THREE**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT**
**EQUAL PROTECTION**

171.	Plaintiff incorporates the allegations in the preceding paragraphs as though fully set forth herein.

172.	FDA's denial of the Citizen Petition treated similarly situated parties differently without adequate justification, and therefore violates the constitutional guarantee of equal protection in violation of 5 U.S.C. § 760(2)(B).

173.	Every day more Donor-Conceived Persons lose access to records of their biological donor. For many of these Donor-Conceived Persons who lose access, they are legal minors who lack the ability to act on their own behalf to obtain records prior to their destruction. Others are blithely unaware, through the concealment by third parties, that they were conceived by donated gametes.  Many will develop symptoms of conditions with a heritable component which proper medical treatment requires their physicians obtain bio-parental medical history.  When the FDA denies Donor-Conceived Persons access to the only known source of physical and mental health information that comprises 50% of the genetic material of these Donor-Conceived American Citizens, and excludes their access to records, the FDA creates irreparable harm by treating similarly situated parties differently without adequate justification, and therefore violates the constitutional guarantee of equal protection in violation of 5 U.S.C. § 760(2)(B).

174. In creating a regulatory scheme which allows its regulated Establishments to permanently destroy records and information in a manner that conflicts with HIPAA, state laws regarding medical record retention of legal minors, the FDA creates irreparable harm by treating Donor-Conceived parties seeking their records differently from persons not born through donated gametes, without adequate justification, and therefore violates the constitutional guarantee of equal protection in violation of 5 U.S.C. § 760(2)(B). This vital information about the anonymous donor, about whom Donor-Conceived Persons often have limited or no information, is based upon the information in the Isel Citizen Petition and in the many comments thereto often destroyed prior to the time the Donor-Conceived Person reaches the age of majority or even knows that they are born from donated gametes. These Records comprise a portion of the Donor-Conceived Person's own Designated Records set which provides them with rights under federal and state laws to access those records, including but not limited to HIPAA and state medical records retention laws. The FDA is acting not in accordance with law by establishing records allowing for destruction of records prior to the time required for maintenance of records under federal and state laws.

**COUNT FOUR**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT**
**FAILURE TO CONVENE RULEMAKING**

175. Plaintiff incorporates the allegations in the preceding paragraphs as though fully set forth herein.

176. The FDA Defendants failed to initial rulemaking or otherwise open a notice-and-comment period before making a pronouncement in the original Response to the Citizen Petition, Exhibit B, that, although the term "communicable diseases" is not specifically defined in section 361 of the PHS Act, the FDA would interpret the term to be limited to illnesses that are due to infectious agents or their toxic products, and therefore would engage in its exclusive regulation of

the entire field of reproductive gametes through 21 C.F.R. 1271 while simultaneously being unconcerned about the issuance of regulations for the purpose of preventing the introduction, transmission, or spread of genetic diseases to those Donor-Conceived Persons it births through the operation of its regulations.

177. Section 361 of the PHS specifically does not have a definition of "communicable diseases" to allow for the flexibility of the definition as science develops. The industry of donated gametes for reproduction is the sole industry of its type regulated by any agency within the United States government.

178. Making this type of novel pronouncement in a footnote which assumes without authority the lack of HHS-delegated power to regulate genetic diseases within reproductive gametes at the same time it exclusively regulates the determination of who is qualified to be a donor of those sperm or oocyte gametes which will be used for reproductive purposes, has the practical effect of divesting an entire class of United States Donor-Conceived Citizens from any rights to obtain information and records about 50% of their own genetic origins, without reasoned explanation and without lawful notice-and-comment period, fails to comply with the APA requirements for establishing new rules.

## COUNT FIVE
## DECLARATORY JUDGMENT ACT

179. Plaintiff incorporates the allegations in the preceding paragraphs as though fully set forth herein.

180. Defendants' failure to grant the Isel Citizen Petition violates the Plaintiff's rights under the Act.

181.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 authorizes the Court to "declare the rights . . . of any interested party seeking such a declaration," in addition to any injunctive or other available relief.

182.    Plaintiff is entitled to a declaratory judgment awarding him declaratory and injunctive relief, attorneys' fees including but not limited to under the Equal Access to Justice Act, costs, and any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff NICHOLAS ISEL respectfully requests this Court:

   A. Hold unlawful and set aside the denial of the Isel Citizen Petition;

   B. Declare the FDA's denial of the Isel Citizen Petition was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure required by law;

   C. Issue declaratory relief declaring such actions of Defendants unlawful;

   D. Issue declaratory relief ordering temporarily restraining Establishments regulated under Title 21 Code of Federal Regulations Part 1271 from any further destruction of biological donors' Relevant Medical Record sets if those donors provided donated gametes for reproductive purposes and would otherwise be permitted to destroy records under § 1271.55(d)(4);

   E. Issue declaratory relief ordering the FDA to commence a rule-making process, with sufficient notice-and-comment period, in order to amend § 1271.55(d)(4) consistent with other applicable federal and state laws and

86

constitutions, in order to ensure that Donor-Conceived Persons are not deprived of their right to access their biological donor's Relevant Medical Record set from an FDA-regulated Establishment while they are legal minors, or for a reasonable amount of time after reaching the age of majority by which time Donor-Conceived Persons are expected to learn of their birth origins through donated gametes;

F. Award to Plaintiff his costs and attorney's fees; and

G. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

_s/Michelle J. Rozovics_
Michelle J. Rozovics, Esq.
ROZOVICS LAW FIRM, LLC
Counsel for Plaintiff

Michelle J. Rozovics, Esq.
Bar Number #6237997
Rozovics Law Firm, LLC
Counsel for Plaintiff Nicholas Isel
1207 North River Road
McHenry, Illinois 60051
Tel. 815-479-9733
mrozovics@rozovicslaw.com

## ATTORNEY CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.


DATED THIS 22nd Day of July 2026

_____
Michelle J. Rozovics, Esq.
ROZOVICS LAW FIRM, LLC
Counsel for Plaintiff




Michelle J. Rozovics, Esq.
Bar Number #6237997
Rozovics Law Firm, LLC
Counsel for Plaintiff Nicholas Isel
1207 North River Road
McHenry, Illinois 60051
Tel. 815-479-9733
mrozovics@rozovicslaw.com

88